OPINION OF THE COURT
 

 Levine, J.
 

 Plaintiff owns a 150-acre tract of land in the Town of Mamaroneck which, since 1921, has been used as a private golf course. This appeal addresses whether the change in zoning of plaintiff’s property in 1994, from residential to solely recreational use, constituted a regulatory taking under the Fifth and Fourteenth Amendments to the United States Constitu
 
 *102
 
 tion. Resolution of this question requires us to ascertain the appropriate standard to be applied in reviewing the sufficiency of the relationship between the Town’s interests and the rezoning determination on this purely regulatory taking claim.
 

 The Bonnie Briar Country Club has leased the land from plaintiff since 1921. The following year, the area in which the Club is located for the first time became subject to a zoning ordinance. The land was zoned for residential use, permitting single family detached homes on lots of at least 15,000 and, in some areas, 30,000 square feet. The area surrounding Bonnie Briar was similarly zoned, and over the years has been developed in accordance with those zoning restrictions.
 

 In the 1960’s, the Town of Mamaroneck began to focus on its diminishing open spaces and in 1966 developed a “Master Plan” in order to address the issue in a comprehensive manner. This Master Plan recommended that Bonnie Briar remain a golf course. A Master Plan “Update” in 1976 recommended that another neighboring golf course — the Winged Foot — also affected by the rezoning in Local Laws, 1994, No. 6 of the Town of Mamaroneck, remain a golf course. In 1985, the two golf course properties were included in a land-use study, “Westchester 2000.” That study also recommended the retention of the golf course properties as recreational areas and open spaces, concluding that development of these properties would increase the risk of flooding from the Sheldrake River. A portion of plaintiff’s property is within the flood plain of the Sheldrake River. In its current non-developed state, the land helps control flooding by acting as a natural detention basin for rising river waters due to storms.
 

 In 1986, the Towns of Mamaroneck and Larchmont together adopted a “Local Waterfront Revitalization Program” (LWRP) for a comprehensive examination of land-use policies. The LWRP was primarily concerned with, and sought effectively to protect against, the flooding potential in both the flood plain and coastal areas. The LWRP identified flood damage to the Town’s wetlands, fish and other wildlife habitats and streams, cautioning the Town to prepare itself for further adverse effects that would result from future changes in land use.
 

 The LWRP found that the Town golf clubs were “appropriate uses which, in addition to their ecological, recreational, architectural and scenic value, provide open space and natural water retention. They should remain in their present use if possible.”
 

 
 *103
 
 In 1988 the Town retained Shuster Associates, a private planning firm, to assist in formulating its comprehensive plan to address and best implement the goals stated in the LWRP. Shuster examined a number of varying development options and issued a report and addendum considering three alternative development schemes. These development schemes did contemplate some residential development, not unlike that subsequently proposed by plaintiff.
 

 Because rezoning these golf course properties required a review pursuant to the State Environmental Quality Review Act (SEQRA), on May 30,1990, defendant Town Board declared its intention to serve as lead agency for the purpose of conducting the SEQRA review and retained yet another planning firm to assist in the review process. After preparation of a Generic Environmental Impact Statement in 1991, the Board issued a Findings Statement in completion of its SEQRA review in 1994. The Findings Statement described in great detail how the various proposed development and rezoning schemes would impact this environmentally sensitive area.
 

 Specifically, the Findings Statement noted that the area was facing “long-term pressure toward continuing urbanization in an already over-developed landscape,” noting that “less than 5% of the Westchester County watershed of the Long Island Sound remains open space.” In response to these concerns over dwindling existing open spaces and to ensure their retention, the Board determined that zoning the Winged Foot and Bonnie Briar club properties solely for recreational uses was the best alternative.
 

 In addition, the Findings Statement explained that further residential development would frustrate the Town’s goal of preserving recreational opportunities for Town and area residents, noting that 70% of Bonnie Briar’s membership resided within a five-mile radius of the property.
 

 Finally, in connection with concerns over flooding, the SE-QRA Findings Statement noted that, without even considering further development beyond the Town’s control, residential development within the Town could increase the flooding already experienced by many area homeowners. Furthermore, the Board was not adequately persuaded that proposed measures to mitigate the increased flooding associated with residential development would be effective.
 

 Based upon all of the foregoing considerations, the Findings Statement concluded that the “Recreation Zone best achieves
 
 *104
 
 the objectives of the Town, State, regional and federal policies that have guided the Town’s comprehensive planning process for almost three decades.” The Town Board rezoned accordingly, enacting Local Law No. 6.
 

 Just months prior to the passage of that law, plaintiff retained its own planning firm and submitted a Preliminary Subdivision Plan for the golf club property to the Town Board. This plan provided for the construction of 71 residential lots, leaving approximately 112 acres of standing open space on the existing 18-hole golf course site. Upon receipt of this plan submitted by plaintiff, the Town Board requested certain revisions with which the plaintiff complied. The final plan submitted by plaintiff comported with the various possible development schemes recommended to the Board by the Shuster planning firm. In the end, however, as previously discussed, the Board chose to implement a rezoning of the property for exclusively recreational use to achieve its stated goals and interests of (1) preserving open space, (2) providing recreational opportunities for Town and other area residents and (3) mitigating flooding of both coastal and flood plain areas.
 

 Plaintiff subsequently commenced this action, the main thrust of which was that Local Law No. 6 effected an unconstitutional taking of its property without just compensation. Plaintiff averred that Local Law No. 6 was not sufficiently related to the three stated purposes and that the application of the zoning ordinance deprived them of all economically viable uses of their land. Plaintiff moved for summary judgment on a number of its various causes of action; defendant opposed the motion and cross-moved for summary judgment dismissing the same claims.
 

 Supreme Court granted defendant partial summary judgment, dismissing plaintiff’s cause of action in which it alleged that there was an insufficiently close relationship between the Town’s goals and its zoning ordinance. That holding was affirmed by the Appellate Division (242 AD2d 356). Subsequently, defendants moved for summary judgment on the remaining causes of action concerning the alleged economic taking of plaintiff’s property brought about by the enactment of Local Law No. 6. This motion was denied by Supreme Court. The Appellate Division reversed, granting defendant’s motion and remitting to Supreme Court for the entry of judgment declaring the law constitutional as applied in this case (256 AD2d 293). This appeal is before us as of right (CPLR 5601 [b] [1]). We now affirm.
 

 
 *105
 
 DISCUSSION
 

 In
 
 Agins v City of Tiburon
 
 (447 US 255), the United States Supreme Court articulated the general test for determining whether “[t]he application of a general zoning law to particular property effects a taking”
 
 (id.,
 
 at 260).
 
 Agins
 
 held that a zoning law effects a regulatory taking if either: (1) “the ordinance does not substantially advance legitimate state interests”
 
 or
 
 (2) the ordinance “denies an owner economically viable use of his land” (id). Plaintiff has abandoned its claim that it has been denied all economically viable uses of its land. Thus, its only remaining claim is that the “substantially advance” alternative regulatory taking-prong of
 
 Agins
 
 is not met here because there is an insufficiently “close causal nexus”
 
 (Manocherian v Lenox Hill Hosp.,
 
 84 NY2d 385, 392;
 
 Rent Stabilization Assn. v Higgins,
 
 83 NY2d 156, 174;
 
 see, Nollan v California Coastal Commn.,
 
 483 US 825) between the rezoning measure and the legitimate public interests defendants sought to achieve.
 

 Relying on this Court’s decisions in
 
 Seawall Assocs. v City of New York
 
 (74 NY2d 92) and
 
 Manocherian v Lenox Hill Hosp. (supra),
 
 plaintiff claims that Local Law No. 6 fails to meet the
 
 Agins
 
 standard because there is not a “close causal nexus” between the Town’s objectives and Local Law No. 6. Plaintiff argues that this was demonstrated as a matter of law, because in the opinion of the Shuster planning firm the same three objectives could be accomplished by less restrictive land control, permitting some residential development. We disagree with plaintiff’s analysis and reject its proposed standard of review.
 

 The close causal nexus standard urged by plaintiffs was derived from two United States Supreme Court cases,
 
 Nollan v California Coastal Commn. (supra)
 
 and
 
 Dolan v City of Tigard
 
 (512 US 374). In
 
 Nollan,
 
 the Supreme Court applied the “substantially advances” prong of the
 
 Agins
 
 standard for a regulatory taking in the context of an exaction. In that case, the State had conditioned the granting of a permit to build a larger residence upon the owners’ conveyance of a public easement across the property. In that specific circumstance, the Supreme Court applied the
 
 Agins
 
 standard to require an “essential nexus” between the property interest exacted from the owner and the identified legitimate governmental objective.
 

 Seven years later, the Supreme Court decided
 
 Dolan v City of Tigard (supra),
 
 another exaction case, in which the municipality conditioned a permit for an expansion of a commercial
 
 *106
 
 establishment upon a dedication of portions of the owner’s property for recreational and flood-control uses. In
 
 Dolan,
 
 the Court elucidated its “essential nexus” requirement in such cases. The Court explained that the essential connection is more than merely some relationship, but, on the other hand, the municipality need not “demonstrate that its exaction is directly proportional to the specifically created need”
 
 (id.,
 
 at 38,8-390). The Court adopted an intermediate position, i.e., that the essential nexus is a “rough proportionality” between the required exaction and the governmental interests involved
 
 (id.,
 
 at 391).
 

 Following the Supreme Court’s
 
 Nollan
 
 and
 
 Dolan
 
 decisions, there was considerable disagreement as to the reach of those holdings. There were takings scholars who read the cases as creating a new standard for all regulatory takings
 
 (see,
 
 Peterson,
 
 Land Use Regulatory “Takings” Revisited: The New Supreme Court Approaches,
 
 39 Hastings LJ 335, 351; Kmiec,
 
 The Original Understanding of the Takings Clause is Neither Weak Nor Obtuse,
 
 88 Colum L Rev 1630, 1648-1654). Indeed, even Justice Brennan, in his dissent in
 
 Nollan,
 
 expressed concern over the heightened level of scrutiny, predicting its general application in takings cases: “the Court demands a degree of exactitude that is inconsistent with our standard for reviewing the rationality of a State’s exercise of its police power for the welfare of its citizens”
 
 (Nollan v California Coastal Commn., supra,
 
 at 842-843).
 

 Other takings scholars opined that the heightened level of judicial scrutiny was applicable only in the specific context of an exaction
 
 (see,
 
 Michelman,
 
 Takings, 1987,
 
 88 Colum L Rev 1600, 1608-1609; Manheim,
 
 Tenant Eviction Protection and the Takings Clause,
 
 1989 Wis L Rev 925, 949-950, nn 146, 149; Tribe, American Constitutional Law § 9-4, at 599, n 20 [2d edj). Judges on this Court likewise differed in interpreting this line of cases
 
 (compare, Seawall Assocs. v City of New York,
 
 74 NY2d 92,
 
 with id.,
 
 at 117 [Bellacosa, J., dissenting],
 
 supra; compare, Manocherian v Lenox Hill Hosp.,
 
 84 NY2d 385,
 
 with id.,
 
 at 400 [Levine, J., dissenting],
 
 supra).
 

 The issue was finally resolved by the United States Supreme Court in
 
 City of Monterey v Del Monte Dunes
 
 (526 US 687),
 
 *
 
 in which the Court reaffirmed the continued viability of the
 
 Agins
 
 
 *107
 
 standard in regulatory takings that do not involve an exaction. In
 
 Del Monte,
 
 the Court expressly held that where, as here, “the landowner’s challenge is based not on excessive exactions but on denial of development * * * the rough-proportionality test of
 
 Dolan
 
 is inapposite”
 
 (id.,
 
 526 US, at 703).
 

 Plaintiff concedes that
 
 Del Monte
 
 clearly removed
 
 Dolan’s
 
 “rough proportionality” inquiry from a general regulatory takings analysis. It asserts, instead, that because the Supreme Court failed expressly to declare as inapplicable
 
 Nollan’s
 
 “essential nexus” test, a reviewing court is still bound to determine if a generally applicable zoning regulation has a close nexus with the interests sought to be furthered. We disagree.
 

 Two reasons persuade us to reject plaintiffs contention that
 
 Del Monte
 
 has left
 
 Nollan’s
 
 “essential nexus” test applicable in all takings cases. First, as we have previously demonstrated, the “rough proportionality” test articulated in
 
 Dolan
 
 was nothing more than the Court’s explication of the required closeness of the connection between the condition of development and the governmental objective under the essential nexus standard
 
 in an exaction case.
 
 Thus, in explicitly rejecting the application of the “rough proportionality” test when, as here, the zoning law merely “denfies] * * * development”
 
 (City of Monterey v Del Monte Dunes, supra,
 
 526 US, at 703), limiting its application to those cases involving exactions, the Supreme Court necessarily rejected the applicability of the “essential nexus” inquiry to general zoning regulations as well.
 

 Second, our disagreement with the plaintiffs reading of
 
 Del Monte
 
 is confirmed by the Court’s treatment of the other major issue before it in that case: whether, in a 42 USC § 1983 damage action for an unconstitutional taking, the plaintiff was entitled to have a jury consider the validity of that alleged taking. Although the
 
 Del Monte
 
 Court was divided over the issue of the availability of a jury trial, all concurring and dissenting Justices agreed upon the applicable standard and that the charge given by the trial court accurately reflected the current standard for regulatory takings analysis when no exaction is involved. The trial court in
 
 Del Monte
 
 instructed the jury that
 

 “one of your jobs as jurors is to decide if the city’s decision here
 
 substantially advanced
 
 any such legitimate public purpose.
 

 
 *108
 
 “ ‘The regulatory actions of the city or any agency
 
 substantially advanc[e] a legitimate public purpose if
 
 the action bears a
 
 reasonable relationship
 
 to that objective’ ”
 
 (City of Monterey v Del Monte Dunes, supra,
 
 526 US, at 701 [emphasis supplied] [alterations in the original]).
 

 Importantly, this charge makes no reference at all to a necessary
 
 essential nexus
 
 between the regulation at issue and the governmental interests at stake.
 

 Here, Local Law No. 6 easily qualifies as a valid regulatory denial of development pursuant to a generally applicable zoning law. Because zoning plaintiffs property for solely recreational use bears a reasonable relation to the legitimate objectives stated within that law (to further open space, recreational opportunities and flood control), the regulatory action here substantially advances those purposes
 
 (see, City of Monterey v Del Monte Dunes, supra,
 
 526 US, at 701).
 

 As we have already described in detail, this shift in the zoning districts was in response to years of-study and documentation regarding the recurrent flooding problems and concerns. The LWRP concluded that “in addition to their ecological, recreational, architectural and scenic value, [the properties’ exclusive use as golf courses] provide [s] open space and natural water retention.” Consequently, the LWRP recommended that the golf courses “should remain in their present use if possible.”
 

 That defendant Board had before it other less restrictive options to choose from in arriving at its ultimate conclusion with respect to zoning is irrelevant. So long as the method and solution the Board eventually chose substantially advances the public interest, it is not this Court’s place to substitute its own judgment for that of the Zoning Board
 
 (see, Rent Stabilization Assn. v Higgins,
 
 83 NY2d 156, 174,
 
 supra
 
 [“The question before us, however, is not the general wisdom or desirability of * * * (the regulation) — that is a question for the legislature”]). It is similarly not for this Court to determine if, in regulating land use, the rezoning determination was more stringent than one might reasonably conclude was necessary to further public objectives
 
 (see, Keystone Bituminuous Coal Assn. v DeBenedictis,
 
 480 US 470, 487, n 16 [“That a land use regulation may be somewhat overinclusive or underinclusive is, of course, no justification for rejecting it”]).
 

 We have considered plaintiffs remaining claims and find them to be without merit.
 

 
 *109
 
 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Bellacosa, Smith, Ciparick and Wesley concur; Judge Rosenblatt taking no part.
 

 Order affirmed, with costs.
 

 *
 

 As shown in both
 
 Del Monte Dunes
 
 and
 
 Eastern Enters, v Apfel
 
 (524 US 498), no majority has accepted the invitation to rework the
 
 Agins
 
 standard
 
 *107
 
 (see, the response of the Court to the contentions of the
 
 amici
 
 in
 
 Del Monte (supra,
 
 526 US, at 704). We similarly decline to address or revisit that standard.