David KITTAY, as Trustee of Duke & Benedict, Inc., Plaintiff,

v.

Rudolph W. GIULIANI, as Mayor of the City of New York, the City of New York, George E. Pataki, as Governor of the State of New York, the State of New York, John P. Cahill, as Commissioner of the New York State Department of Environmental Conservation, the New York State Department of Environmental Conservation, Antonia C. Novello, as Commissioner of the New York State Department of Health, the New York State Department of Health, James Tierney, as Inspector General of the New York City Watershed, Joseph Miele, Sr., as Commissioner of the New York City Department of Environmental Protection, New York City Department of Environmental Protection, Robert J. Bondi, as Putnam County Executive, the County of Putnam, Frank J. Del Campo, as Supervisor of the Town of Carmel, the Town of Carmel, Lois C. Zutell, as Supervisor of the Town of Southeast, the Town of Southeast, Ann Marie Baisley, as Supervisor of the Town of Kent, and the Town of Kent, Defendants.

No. 99 CIV. 5761(BDP).

United States District Court, S.D. New York.

Sept. 7, 2000.

Michael Peoples, Kittay Gold & Gershfeld, White Plains, NY, for Plaintiff.

Christopher G. King, City of New York, Law Department, New York, for Defendant City of New York.

Rachel Zaffran, Norman Spiegel, State of New York, Office of the Attorney General, New York, NY, for Defendant State of New York.

Daniel A. Seymour, Bank, Sheer, Servino & Seymour, White Plains, NY, for County of Putnam, Town of Kent.

## MEMORANDUM DECISION AND ORDER

BARRINGTON D. PARKER, Jr., District Judge.

Plaintiff David Kittay, as Trustee of the bankruptcy estate of Duke & Benedict, Inc. ("D & B"), commenced this action against defendants seeking declaratory judgment, injunctive relief and damages for violations of plaintiff's rights under the United States Constitution, 42 U.S.C. § 1983 (" § 1983"), the New York State Constitution, the New York Public Health Law ("NYPHL"), and New York common law.

Defendants Rudolph W. Giuliani, the City of New York, the New York City Department of Environmental Protection and Joel A. Miele, Sr., its Commissioner (collectively, the "City Defendants"), and George Pataki, the State of New York, John P. Cahill, the New York State Department of Environmental Conservation, Antonia C. Novello, the New York State Department of Health and James Tierney (collectively, the "State Defendants") move, separately, to dismiss the Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). The defendants also include Putnam County, the Towns of Carmel, Southeast and Kent, as well as a number of local officials servicing those entities. All of these defendants have joined the Motions to Dismiss which, for the reasons set forth below, are granted.

## BACKGROUND

D & B is a Delaware corporation engaged in real estate development located in White Plains, New York. D & B filed for Chapter 11 bankruptcy protection on January 24, 1997, and Kittay was appointed as Trustee in January 1999. D & B's assets almost entirely consist of approximately 650 acres of undeveloped real property located within the Watershed area in Putnam County, New York. D & B claims that the regulations, challenged in this litigation, inhibiting development in the Watershed area, unlawfully render its property unuseable.

The factual underpinnings in this matter span many years and involve numerous state and local officials and governmental entities. For purposes of deciding this motion, however, the Court must construe the pleadings in favor of the plaintiff, and accept as true all factual allegations in the Amended Complaint. See Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir.1998); Serrano v. 900 5th Avenue Corp., 4 F.Supp.2d 315, 316 (S.D.N.Y.1998). The following facts are construed accordingly.

## I. Regulation of New York City Water

New York City provides drinking water to nearly nine million citizens of the State of New York, including seven and a half million city residents and over one million residents in four upstate counties. The Watershed area from which the City obtains its drinking water stretches over a two thousand square mile area, touching parts of eight upstate counties, sixty towns and twelve villages.

Historically, the State has granted New York City extraterritorial power to protect the purity of its water supply and to regulate activities in the Watershed regions that could denigrate those waters, and these powers have been applied with varying degrees of intensity since the late 1700s.[1] See NYPHL § 1100(1). In the early 1990's, the United States Environmental Protection Agency (the "EPA") and the New York State Department of Health ("NYS Department of Health") ordered the City to meet certain clean water standards. Environmental experts purportedly advised that the City build a water

---

1. For a history of the implementation of these powers, see Loft Corp. et al. v. City of New York, No. 353/94, slip op. at 9–13 (N.Y. Sup. Ct. Putnam Co. June 24, 1997).

filtration system to meet these standards, which would cost City residents nearly $6–8 billion for construction and $300 million per year for operation. According to plaintiff, in order to avoid the enormous cost of this system, the City decided to exercise its extraterritorial regulatory powers and proposed new regulations to restrict land use by upstate property owners in the Watershed.

### A. The MOA

Due to opposition and extensive litigation by local communities and private landowners challenging the proposed regulations, plaintiff contends that the City, with the help of New York State, entered into secret negotiations with local government officials from the various municipalities making up the Watershed. Throughout the year-long negotiations, private landowners were allegedly excluded and were subjected to a State-imposed gag order on information concerning the progress of the negotiations.

In January 1997, New York City entered into a comprehensive agreement with the EPA, the State of New York, over eighty Watershed municipalities, and several environmental groups. This agreement, known as the New York City Watershed Memorandum of Agreement (the "MOA"), established a cooperative framework through which the various government agencies and other parties would resolve uses affecting water purity in the Watershed.[2] Three parts of the MOA are relevant to this action.

First, the MOA provides the terms of the City's land acquisition program under which the City may offer to purchase certain sensitive properties from a willing landowner at "fair market value" (as defined in the MOA)[3], which the landowner is free to reject. MOA at ¶¶ 54–86.

Second, the MOA calls for numerous payments by the City to local Watershed governments to "enhance water quality in the Watershed and the economic and social character of the Watershed communities." MOA at ¶ 119. In particular, the City agreed to pay millions of dollars in "Good Neighbor Payments" to each municipal signatory according to the percentage of land area that each municipality has within the Watershed, to be used "solely to pay for the capital costs of designing, constructing and installing public works or public improvements, or purchasing public equipment ... that will benefit the public at large." MOA at ¶ 147(b)(iii). Moreover, the City agreed to reimburse Watershed officials for the expenses incurred in negotiating the terms of the MOA, including legal fees.

According to plaintiff, these payments were made as improper inducements to secure local acceptance and implementation of the MOA, and local elected officials were made to understand that they would receive promotions or appointments to positions in certain administrations if they accepted the Watershed agreement.

Third, the MOA calls for the adoption by each Watershed municipality of proposed administrative regulations designed to protect the sources of public water from contamination. MOA at ¶¶ 87–96.

---

2. As plaintiff relies heavily on the terms of the MOA in the Amended Complaint, this Court may properly refer to that agreement in resolving the motions to dismiss. *See Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993) (for purposes of a 12(b)(6) motion, a court may consider "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied upon in bringing suit").

3. According to the MOA, "fair market value" is determined by an independent appraisal obtained by the City, performed by an independent, certified New York State appraiser. In so doing, the City must consider a second appraisal provided by the landowner, so long as that appraisal is completed no earlier than one year prior to the date of the City's appraisal, or the later of (i) six months after the owner received the City's appraisal or (ii) six months from the effective date of the MOA. *See* MOA at ¶ 61.

According to plaintiff, the final version of the MOA was presented to the legislative bodies of the Watershed municipalities and their constituent landowners for consideration with virtually no time for review or debate. Although some local legislators protested that they had not been given time to read the MOA and proposed regulations, the agreement was ultimately approved and implemented by virtually all the government entities affected.

## B. The Regulations

Consistent with the MOA, the proposed regulations were approved by the NYS Department of Health and New York City under the NYPHL (the "Regulations"), taking effect in the City on May 1, 1997 and as State regulations in July, 1998. Because the Regulations were promulgated by both the City and the NYS Department of Health, they were subject to the public notice and comment procedures set forth in the City Administrative Procedure Act ("CAPA") and the State Administrative Procedure Act ("SAPA"). Under both CAPA and SAPA, interested parties at that point had an opportunity to review and comment on the proposed regulations before they became effective.

The Regulations prohibit enumerated activities that could cause degradation of surface water quality, including sewage treatment facilities, septic systems, stormwater runoff, new impervious surfaces and petroleum storage facilities. *See* Watershed Regulations §§ 18–31 through 18–45; 10 N.Y. Comp.Codes R. & Regs. §§ 128–3.1 through 128–4.5. In order to engage in a regulated activity, a party must apply for a permit, or alternatively, may apply for a variance from the Regulations. *See* Watershed Regulations §§ 18–23, 18–61. Furthermore, the Regulations provide that any denial of a permit or variance may be appealed administratively. *See id.* Upon exhaustion of the administrative appeal, a party may continue its challenge in state court under Article 78 of the New York State Civil Practice Law and Rules, or

may assert a takings claim under NYPHL § 1105 or the New York State Constitution. It is not disputed that neither Kittay nor D & B availed themselves of any of these administrative procedures.

Plaintiff contends that the Regulations severely restrict all activities required to undertake any residential and commercial development in the Watershed, and that they strip virtually all economic value from plaintiff's property in Putnam County. In particular, plaintiff alleges that since January 1999, four potential buyers have made offers for D & B's property, but the offers were withdrawn after potential buyers determined they could not afford the cost of compliance with the new Regulations. Plaintiff also contends that the variance procedures are too onerous to be reasonably fulfilled, and that compliance with them should be excused as futile. More specifically, Kittay, as trustee of a bankrupt estate charged with the preservation of limited assets, claims that he lacks the financial resources to fund the requisite studies or to pursue the administrative steps required to receive variances or administrative relief from the Regulations.

## II. Prior State Court Action

In 1994, D & B joined a group of approximately fifty landowners that sued the City in New York Supreme Court, Putnam County, to invalidate the Regulations, alleging state law claims of inverse condemnation and injury to property. The City moved to dismiss the suit on the grounds that the claims were not ripe for adjudication because no final determination had been made with respect to the application of the Regulations to plaintiffs' properties. Although the trial judge denied the motion, the New York Appellate Division reversed and dismissed the action in a decision dated April 19, 1999, holding that plaintiffs' claims were not ripe for adjudication. *See Loft Corp. v. City of New York*, 260 A.D.2d 549, 688 N.Y.S.2d 620 (2d Dep't 1999). Subsequently, the New York Court of Appeals denied plaintiffs' request for

leave to appeal. *Loft Corp. v. City of New York*, 94 N.Y.2d 757, 724 N.E.2d 770, 703 N.Y.S.2d 74 (1999).

### III. This Action

Plaintiff commenced this federal action in July 1999, and filed an Amended Complaint in November 1999. The seventy-two page Amended Complaint challenges provisions of the MOA and Regulations facially and as-applied to plaintiff's property. The Amended Complaint alleges that defendants' conduct in negotiating, approving, and implementing the MOA and Regulations—including, *inter alia*, the failure to provide property owners adequate notice and opportunity with respect to the formulation of the MOA and Regulations, the payment of "Good Neighbor" funds to improperly induce local officials to support the MOA and Regulations, the exclusion of property owners from the negotiation of the MOA, and the strict enforcement of the Regulations that diminish value from plaintiff's property—violates the United States Constitution, the New York State Constitution, and New York State statutory and common law, and supports claims under 42 U.S.C. § 1983.

Under the United States Constitution and § 1983, plaintiff first alleges that defendants' conduct—and the terms of the MOA and Regulations—constitute a taking of property without just compensation in violation of the Fifth and Fourteenth Amendments of the United States Constitution. Second, plaintiff contends that his substantive due process rights under the Fourteenth Amendment were denied, claiming that the "process by which the [MOA] and Regulations were proposed, negotiated, promulgated and implemented, and the [MOA] and Regulations themselves, are irrational and not reasonably related to any legitimate government interest." Amended Complaint at ¶ 158. Third, plaintiff alleges that defendants violated his procedural due process rights under the Fourteenth Amendment, when they denied plaintiff a meaningful opportunity to be heard in connection with the adoption of the MOA and Regulations. Fourth, the Amended Complaint alleges that the MOA and Regulations violate plaintiff's equal protection rights by impermissibly discriminating against landowners in the Watershed. Finally, plaintiff claims that its First Amendment right to petition the government for redress of grievances was denied by defendants "rendering futile plaintiff's ability to seek the support and assistance of its local or state representatives," when government officials agreed not to litigate the validity of the MOA or the Regulations. Amended Complaint at ¶ 181.

Plaintiff makes similar state law claims, namely, taking of property without just compensation, violations of due process, equal protection, and the right to petition the government. Plaintiff also contends that defendants violated the State Constitution's Home Rule provision when it conducted secret negotiations and made payments to public officials to "buy" their support. *See* Article 9 of the New York State Constitution. Finally, plaintiff claims that defendants are required to compensate it for the alleged impact of the Regulations to is property under § 1105 of the NYPHL.

The Amended Complaint seeks declaratory judgment determining that the MOA and Regulations are invalid and unenforceable on their face and as-applied to plaintiff. Further, it requests a permanent injunction prohibiting the enforcement of the MOA and Regulations. Finally, plaintiff seeks monetary damages and reasonable attorneys' fees pursuant to § 1983.

All defendants have moved to dismiss the Amended Complaint. Although they make separate motions, their grounds for dismissal often overlap, most significantly in arguing that plaintiff's claims concerning the MOA and Regulations as-applied to D & B's properties are not yet ripe, and that, in any event, plaintiff's facial challenge against the Regulations fails to state a claim. *See* Fed.R.Civ.P. 12(b). Defen-

dants also argue that the state claims should be dismissed on the ground that they are barred by the prior State Court Action and that this Court should abstain from considering plaintiff's claims under the *Burford* abstention doctrine. For purposes of this opinion, the Court will treat defendants' motions together.

## DISCUSSION

A district court may grant a motion to dismiss pursuant to Fed.R.Civ.P. 12(b) if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Tarshis v. Riese Organization,* 211 F.3d 30, 35 (2d Cir.2000) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In making its determination, this Court must construe the Amended Complaint's allegations in a light most favorable to the plaintiff. *See Desiderio v. National Ass'n of Sec. Dealers, Inc.,* 191 F.3d 198, 202 (2d Cir.1999).

### I. "As–Applied" Constitutional Claims

■ Defendants contend that plaintiff's federal as-applied claims should be dismissed because, *inter alia,* they are not yet in a posture suitable for judicial resolution. In order for claims to be justiciable under Article III, courts have long recognized that the controversy, as an initial matter, must be ripe. *See Marchi v. Board of Cooperative Educational Services of Albany,* 173 F.3d 469 at 478 (2d Cir.1999) ("ripeness is a constitutional prerequisite to exercise of jurisdiction by federal courts.") (internal quotations omitted); *Thomas v. City of New York,* 143 F.3d 31, 34 (2d Cir.1998). Particularly, as here, where the dispute involves administrative and zoning regulations, the ripeness doctrine restrains courts from entangling themselves in abstract disagreements over policies, freeing agencies from judicial in-

terference until an actual administrative decision has been formulated and its effects concretely realized. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–9, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *Pennell v. City of San Jose,* 485 U.S. 1, 10, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988) ("We have found it particularly important in takings cases to adhere to our admonition that the constitutionality of statutes ought not to be decided except in an actual factual setting that makes such a decision necessary.").

■ Where the controversy originates from a challenge to a statute or policy prior to its enforcement, the ripeness doctrine requires that the challenge arise from a real, substantial dispute between the parties involving a definite and concrete matter. *See Marchi,* 173 F.3d at 478. In *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*—a case involving a landowner's challenge to the application of zoning laws—the Supreme Court held that in order for a claim to be ripe, the government agency charged with enforcing the relevant regulation must have first rendered a "final decision" applying the regulation to the property at issue.[4] 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). There, the landowner sued the county's planning commission after it denied plaintiff's application for development of a residential subdivision plan. Noting "[plaintiff's] refusal to follow the procedures for requesting a variance, and its refusal to provide specific information about the variances it would require," the Supreme Court concluded that plaintiff "had not yet obtained a final decision on how it will be allowed to develop its property." *Id.* at 190, 105 S.Ct. 3108. Accordingly, "until the administrative agency has

---

4. Because the Court finds that plaintiff does not satisfy the first part of the *Williamson* test, it is unnecessary to address its second prong—namely, that plaintiff attempt to seek

just compensation through the procedures provided for by the state. *Id.* at 194, 105 S.Ct. 3108.

arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question," *e.g.*, that no variances or permits will be granted, a takings claim is premature.[5] *Id.* at 191, 105 S.Ct. 3108; *see Agins v. Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (takings claim unripe because no development plan submitted to agency for approval).

◼ Here, the Amended Complaint fails to allege and Kittay concedes that he has sought no approvals or variances from any governmental agencies. Without a final agency decision regarding the applicability of the Regulations to D & B's property, the alleged injury to D & B's estate is, for Article III purposes, speculative. If plaintiff were to "seek administrative relief under the [variance or permit] procedures, a mutually acceptable solution might well be reached with regard to individual properties, thereby obviating any need to address the constitutional questions. The potential for such administrative solutions confirms the conclusion" that the issues are not yet ripe. *Hodel v. Virginia Surface Mining and Reclamation Assn., Inc.*, 452 U.S. 264, 297, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). Thus, plaintiff has failed to obtain a final—or, for that matter, any—decision concerning the applicability of the Watershed Regulations or the MOA to its property and, in effect, invites this Court to address important and potentially complex constitutional and regulatory issues in a vacuum. *See Goldfine*, 80 F.Supp.2d at 159 (dismissing action arising from Watershed Regulations because plaintiff did not apply for necessary approvals).

Instead, plaintiff contends that because any resort to the administrative remedies would be futile, it should be excused. Specifically, D & B claims that the bankrupt estate does not have the resources necessary to pay the professional fees required to prepare or process an application, and lacks the time and motivation necessary to negotiate the application process. In addition, the trustee contends that his statutory and fiduciary duties to the creditors of D & B to conserve and maximize the assets of the estate would be compromised were he to engage in the risky, speculative project of entering into a lengthy and expensive approval process involving raw land. Moreover, plaintiff argues that even if he had the resources to attempt the approval process, requiring him to do so would be futile because defendants have established a strict policy against development in the Watershed—regularly denying development applications and instituting litigation against developers to halt previously approved construction—and because the variance procedures in the Regulations do not provide a meaningful prospect of effective relief.

◼ Although the futility exception is flexible, the Trustee's proposed application to this case would stretch it beyond the point of recognizability. While the Second Circuit has yet to define the exact contours of this exception, other Circuits have interpreted the futility exception far more narrowly than what plaintiff proposes. *See Gilbert v. Cambridge*, 932 F.2d 51, 61 (1st Cir.1991) (for the futility exception to apply, the prospect of refusal must be certain); *Herrington*, 857 F.2d at 570 ("mere allegations ... that [plaintiff] has done everything possible to obtain acceptance ... will not suffice to prove futility."). This exception was created to "protect

**5.** Though *Williamson* applied specifically to takings claims, subsequent courts have applied this requirement to other claims arising from the application of regulations to a particular property. *See Southview Assocs. Ltd. v. Bongartz*, 980 F.2d 84, 96–97 (2d Cir.1992) (applying ripeness analysis to due process claims); *Herrington v. County of Sonoma*, 857 F.2d 567, 569 (9th Cir.1988) (applying ripeness analysis to substantive due process, procedural due process and equal protection claims); *Unity Ventures v. County of Lake*, 841 F.2d 770, 775 (7th Cir.1988) (same). Accordingly, the ripeness inquiry is the same for each of plaintiff's as-applied takings, due process, equal protection and First Amendment claims. *See also Goldfine v. Kelly*, 80 F.Supp.2d 153, 158 (S.D.N.Y.2000).

**350**

property owners from being required to submit multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved." *Southern Pacific Transportation Co. v. City of Los Angeles,* 922 F.2d 498, 504 (9th Cir.1990) (internal quotations omitted). Therefore, at least one meaningful application for development must be made in order to invoke the futility exception and consider a claim ripe for adjudication. *Kinzli v. City of Santa Cruz,* 818 F.2d 1449, 1455 (9th Cir.1987) ("the futility test is not met where a meaningful application has not yet been made") (internal quotations omitted); *Gilbert,* 932 F.2d at 61 ("at a bare minimum, [a] property owner cannot rely on the futility exception until he or she makes at least one meaningful application for administrative relief") (internal quotations omitted); *see also MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 352 n. 8, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986); *Goldfine,* 80 F.Supp.2d at 160 ("[one] meaningful application alone may be insufficient to invoke the futility exception.").

It is undisputed—and, indeed, plaintiff concedes—that not one application has been made for a permit or variance. In any event, plaintiff cites no authority, and this Court is aware of none, that permits a litigant to maintain an otherwise premature lawsuit on the grounds of financial hardship, or status as a bankruptcy trustee,[6] or on the basis of allegations claiming that defendants typically deny permit applications. Well established principles of ripeness counsel against such a wholesale extension of the ripeness doctrine, which, if accepted, would eviscerate it. Accordingly, each of plaintiff's as-applied claims alleging a taking without just compensation and violations of plaintiff's due process, equal protection and First Amendment rights under the

United States Constitution and § 1983 are dismissed, without prejudice, on the ground that they are not ripe.

## II. Facial Claims

Next, plaintiff contends that the MOA and the Regulations on their face are unconstitutional *per se,* regardless of how they might be enforced. Such claims, according to plaintiff, are ripe by their very nature. *See Suitum v. Tahoe Regional Planning Agency,* 520 U.S. 725, 736 n. 10, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997) ("facial challenges to regulation are generally ripe the moment challenged"); *Pennell,* 485 U.S. at 11–14, 108 S.Ct. 849 (rejecting facial claim on the merits despite dismissing as-applied claims on grounds of ripeness); *Kawaoka v. City of Arroyo Grande,* 17 F.3d 1227, 1232 (9th Cir.), *cert. denied,* 513 U.S. 870, 115 S.Ct. 193, 130 L.Ed.2d 125 (1994) ("ripeness requirements are relevant only to as-applied challenges, and not to facial challenges"). Defendants argue, however, and the Court agrees, that plaintiff's facial claims are not ones upon which relief could be granted. *See* Fed.R.Civ.P. 12(b)(6).

### A. Takings

■ The Amended Complaint alleges that the MOA and the Regulations—by their language and mere enactment—effects an unjust taking of D & B's property, violating the Fifth and Fourteenth Amendments to the United States Constitution.

Plaintiff's facial challenge, however, is problematic because the Supreme Court has made quite clear that "the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking." *U.S. v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 127, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). Rather, where a landowner alleges that certain land-use

---

6. In the general context of bankruptcy law, a trustee "stands in the shoes of the debtor, and does not have any greater rights than the debtor would have if there were no bankruptcy filing." *Campo v. Sontag,* 151 B.R. 664,

669 (Bkrtcy.E.D.N.Y.1993). Accordingly, plaintiff's status as a bankruptcy trustee should not to have any bearing on the issue here.

regulations effect a *facial* taking, he must show that the very language of the regulations "denies the owner of essentially all economically viable use of his land." *Hodel,* 452 U.S. at 295–96, 101 S.Ct. 2352 (internal quotations omitted); *see Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1016 n. 6, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Keystone Bituminous Coal Association v. DeBenedictis,* 480 U.S. 470, 495, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); *see generally Village of Euclid, Ohio v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

Here, the Regulations—by their very language—provide for permit and variance procedures. Theoretically, therefore, D & B is able to engage in regulated activities, subject to government approval.[7] Because plaintiff is permitted to make an application for relief from the Regulations—which he has not yet done—he cannot argue that the Regulations, on their face, or by their mere enactment, deprive him of the economic use of his property. *See Agins,* 447 U.S. at 262, 100 S.Ct. 2138 (dismissing plaintiff's facial takings claims, noting "[a]t this juncture, [plaintiffs] are free to pursue their reasonable investment expectations by submitting a development plan to local officials. Thus, it cannot be said that the impact of general land-use regulations" is a taking.)

Moreover, the Amended Complaint fails to allege how the language of the MOA or the Regulations deprives plaintiff of all economic use of his property. Nothing in the text of the MOA or the Regulations prevents plaintiff from selling the property, from developing it or from a variety of economic uses. In addition, the MOA and the Regulations are not all-encompassing. Activities, such as certain agricultural uses of the property, that do not threaten the City's water supply are not subject to regulation. *See Hodel,* 452 U.S. at 296, 101 S.Ct. 2352 (regulation not a taking where it did not "purport to regulate alternate uses" to which the land could be used). Indeed, this identification of an economically viable and legally permissible use of the property alone is generally sufficient to defeat a facial takings claim. *See id.,* 452 U.S. at 296 n. 37, 101 S.Ct. 2352 (statute prohibiting surface mining on land did not "on its face, deprive [plaintiffs] ... of economically viable use of their land since it [did] not proscribe nonmining uses of such land"); *see also Suitum,* 520 U.S. at 736 n. 10, 117 S.Ct. 1659 (facial challenges face an "uphill battle, since it is difficult to demonstrate that mere enactment of a piece of legislation has deprived [the owner] of economically viable use of [his] property") (internal quotations omitted).[8] Thus, assuming *arguendo,* that the effect of the MOA and the Regulations is to reduce the ultimate profitability of the land or to make previously contemplated uses uneconomical, those consequences do not equate to an unconstitutional facial taking.

---

**7.** This Court's holding dismissing the facial challenges does not preclude plaintiff from attempting to show later that the Regulations and the MOA as-applied to plaintiff's property effect an unjust taking, or are otherwise unconstitutional—presuming, of course, such claims are ripe. *See, e.g., Hodel,* 452 U.S. at 297 n. 40, 101 S.Ct. 2352.

**8.** Plaintiff's reliance upon *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), *Dolan v. Tigard,* 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), and *Seawall Assocs. v. City of New York,* 74 N.Y.2d 92, 542 N.E.2d 1059, 544 N.Y.S.2d 542 (1989) for the application of the rough proportionality test in this matter is inapposite. Those cases involved situations where the government's actions effected an exaction—a mandated dedication of property—or physical taking, neither of which is applicable here. *See City of Monterey v. Del Monte Dunes,* 526 U.S. 687, 702–03, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999) (Supreme Court holding that "rough proportionality test of *Dolan* [not extended] beyond the special context of exactions"); *Bonnie Briar Syndicate, Inc. v. Town of Mamaroneck,* 94 N.Y.2d 96, 106–107, 699 N.Y.S.2d 721, 721 N.E.2d 971 (1999) (New York Court of Appeals ruling that the rough proportionality test "is inapposite in regulatory takings that do not involve an exaction").

### B. Substantive Due Process

■ To challenge the facial validity of a zoning regulation on substantive due process grounds, Kittay must allege that (1) the regulation on its face deprives him of a constitutionally protected property interest, and (2) the regulation lacks any rational relationship to a legitimate government interest. *See Crowley v. Courville*, 76 F.3d 47, 52 (2d Cir.1996); *Brady v. Town of Colchester*, 863 F.2d 205 (2d Cir.1988). These principles are applied against the admonition that "federal courts should not become zoning boards of appeal" when reviewing land use determinations. *Sullivan v. Town of Salem*, 805 F.2d 81, 82 (2d Cir.1986).

■ Given this backdrop, even assuming plaintiff can show that he was deprived of a constitutionally protected interest (a doubtful proposition), he fails to satisfy the heavy burden of demonstrating that the MOA or the Regulations on their face lack *any* rational relationship to a legitimate governmental interest. *See Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 640–41, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *DeMichele v. Greenburgh Central School District No. 7*, 167 F.3d 784, 789 (2d Cir.1999) ("a facial challenge to a legislative act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."); *South County Sand & Gravel Co., Inc. v. Town of South Kingstown*, 160 F.3d 834, 836 (1st Cir.1998).

Courts have repeatedly upheld land use restrictions based on environmental concerns as reflecting legitimate government interests, *see, e.g., Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960) (local air pollution regulation); *Orange Lake Associates, Inc. v. Kirkpatrick*, 21 F.3d 1214 (2d Cir.1994) (limitation on development in an environmental sensitive area); *Wambat Realty v. State*, 41 N.Y.2d 490, 362 N.E.2d 581, 393 N.Y.S.2d 949 (1977) (preservation of state park), including regulations designed to avert contamination and degradation of water supply, *see, e.g., Stern v. Halligan*, 158 F.3d 729, 732 (3d Cir.1998) ("regulating the water supply is a basic and legitimate government activity"); *City of Utica v. Water Pollution Control Board*, 5 N.Y.2d 164, 168, 156 N.E.2d 301, 182 N.Y.S.2d 584 (1959) ("legislation designed to regulate and control [water] pollution is within the scope of state's power"); *see generally Long Island Pine Barrens Society, Inc. v. Planning Bd. of Town of Brookhaven*, 80 N.Y.2d 500, 606 N.E.2d 1373, 591 N.Y.S.2d 982 (1992). There can be no serious dispute that the pursuit of clean water is a legitimate government concern.

Nor is there any doubt that the MOA and the Regulations are rationally related to this interest. It is, of course, not this Court's function to determine whether the Regulations are the best way to achieve the goal of clean water, or even if they are a sensible response to a complex problem. Rather, this Court need only find that the MOA and the Regulations are a rational response to legitimate governmental concerns, and in this respect, the Court is confident that such a relationship exists. *See Crowley v. Courville*, 76 F.3d at 52 (substantive due process claim requires that the government had "no legitimate reason for its decision") (internal quotations omitted); *Kawaoka*, 17 F.3d at 1234 ("in a substantive due process challenge, we do not require that the City's legislative acts actually advance its stated purpose, but instead look to whether the governmental body could have had no legitimate reason for its decision.") (internal quotations omitted). Accordingly, plaintiff's facial challenge on substantive due process grounds is dismissed.

### C. Procedural Due Process

■ Plaintiff, claiming a violation of his procedural due process rights, contends that he was not afforded adequate notice

nor a meaningful opportunity to be heard with respect to the adoption of the MOA and the Regulations. It is well-settled, however, that legislative action is generally not subject to the notice and hearing requirements of the due process clause, *see Interport Pilots Agency, Inc. v. Sammis,* 14 F.3d 133, 142 (2d Cir.1994) ("[o]fficial action that is legislative in nature is not subject to the notice and hearing requirements of the due process clause"); *RR Village Assoc. v. Denver Sewer Corp.,* 826 F.2d 1197, 1204–05 (2d Cir.1987) ("no notice or opportunity to be heard would [be] required if the act of the Town Board had been legislative"), reflecting the principle that the Constitution does not grant the public a right to be heard by governmental entities making decisions of policy. *Minnesota State Board for Community Colleges v. Knight,* 465 U.S. 271, 283, 104 S.Ct. 1058, 79 L.Ed.2d 299 (1984) ("[w]here a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption.... [Statutes] are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard."). Instead, the public may influence the legislative process by effectuating its power over those elected officials through, *inter alia,* the electoral process, or through "judicial review after rule promulgation". *Interport,* 14 F.3d at 142 (internal quotations omitted).

■ Here, the promulgation of the Regulations, including the negotiation of the MOA, was the result of a series of legislative acts based upon a broad policy decision by the relevant municipalities concerning the integrity of New York City's water supply. *See id.* at 143 (describing legislative actions as those acts made by governmental entities which are based on "facts relating to ... questions of social or economic policy or of broad economic factors," rather than of a particular person or group of persons). Since rights to notice and a hearing were never triggered, plaintiff's procedural due process rights were not violated. *See Air Line Pilots Assoc. v. Quesada,* 276 F.2d 892 (2d Cir.1960) (regulations that have general prospective application are considered legislative acts not subject to procedural due process rights, even where they may affect property rights); *see also City of Madison v. Wisconsin Employment Relations Commission,* 429 U.S. 167, 175 n. 8, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) ("Plainly, public bodies may confine their meetings to specified subject matter and may hold non-public sessions to transact business").

## D.  Equal Protection

■ Plaintiff next contends that the MOA and the Regulations facially violate the equal protection clause of the Fourteenth Amendment because they unfairly impose economic burdens on Watershed landowners while relieving city landowners and residents of parallel burdens. Amended Complaint ¶¶ 161–167. Where neither a fundamental right nor a suspect class is implicated, a statute's treatment of different classes carries with it a heavy presumption of constitutionality, and a statute is constitutionally deficient only where no rational relationship exists between the classification and a legitimate legislative concern.[9] *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) ("the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines."); *Pennell,* 485 U.S. at 14, 108 S.Ct. 849 ("the standard [for a facial equal protection challenge] is deferential; [defendants] need only show that the classification scheme embodied in the ordinance is rationally related to a legiti-

---

9. Plaintiff concedes that the appropriate standard of review by this Court is the rational basis test.

mate state interest.") (internal quotations omitted).

Presuming that the MOA and the Regulations create different classes of persons recognizable under a constitutional analysis—the Watershed landowners and the City residents—Kittay's facial equal protection challenge still fails because he cannot show that the regulations on their face bear no rational relation to a legitimate governmental interest. As discussed earlier (*supra* II.B.), the Regulations rationally relate to the government's interest in protecting the City's drinking water on what is clearly a valid governmental concern. *See Dukes,* 427 U.S. at 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) ("States are accorded wide latitude in regulation" under an equal protection analysis); *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) (the Court need only decide whether the legislature could have rationally decided that the statute would meet a valid objective).

E. First Amendment

Finally, plaintiff alleges that his First Amendment right to petition the government for redress was abridged when government officials contracted away their right to challenge the MOA or the Regulations in the future. The right to which plaintiff refers, however, is not a restriction on the right of governmental bodies to deal with each other. The right to petition in general guarantees only that individuals have a right to communicate directly to government officials, and that individuals have the right of access to the courts to redress constitutional violations. *See McDonald v. Smith,* 472 U.S. 479, 482, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985); *Mozzochi v. Borden,* 959 F.2d 1174, 1180 (2d Cir.1992). It does not guarantee, as plaintiff contends, that governmental officials may not enter agreements terminating, settling or prospectively avoiding litigation, nor does it ensure that an elected official will necessarily act a certain way or respond in a certain manner to requests from his constituents. *Minnesota State Board,* 465 U.S. at 285, 104 S.Ct. 1058. Indeed, courts have recognized that government may conduct its business in private consistent with the First Amendment right to petition. *West Farms Associates v. State Traffic Commission of State of Connecticut,* 951 F.2d 469, 473 (2d Cir. 1991). As plaintiff does not allege that the MOA or Regulations prevented him from communicating any grievance to elected officials, or that his access to the courts is somehow denied by the Regulations, plaintiff's First Amendment facial claims are dismissed.

III. State Law Claims

As this Court has dismissed all of plaintiff's federal claims, there remains no independent basis for federal jurisdiction over the remaining state law claims. Accordingly, such pendent state claims are dismissed. *See Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("when the federal law claims have dropped out of the lawsuit in its early stages and only state law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice"); *Baylis v. Marriott Corp.,* 843 F.2d 658, 665 (2d Cir.1988) ("[w]hen all basis for federal jurisdiction have been eliminated from a case so that only pendent state claims remain, the federal court should ordinarily dismiss the state claims").

Accordingly, it is unnecessary for this Court to address the defendants' arguments concerning collateral estoppel and abstention doctrine.

**CONCLUSION**

In sum, plaintiff's as-applied claims under the Constitution and § 1983 are dismissed, without prejudice, as they are premature. Plaintiff's facial challenges to the Regulations and MOA under the Constitution and § 1983 are dismissed because

they fail to state claims upon which relief could be granted, and plaintiff's state law claims are dismissed as this Court declines to exercise pendent jurisdiction.

For the foregoing reasons, the defendants' motions to dismiss are granted. The Clerk of the Court is directed dismiss the Amended Complaint.

**SO ORDERED.**