[822 NE2d 1214, 789 NYS2d 696]

In the Matter of PAUL SMITH et al., Appellants, v TOWN OF MENDON et al., Respondents.

Argued November 17, 2004; decided December 21, 2004

1

**POINTS OF COUNSEL**

*Galvin and Morgan,* Delmar (*James Morgan* and *Madeline Sheila Galvin* of counsel), for appellants. I. The Supreme Court's decision in *Dolan v City of Tigard* (512 US 374 [1994]) applies to this case. (*Del Monte Dunes at Monterey, Ltd. v City of Monterey,* 95 F3d 1422, 526 US 687.) II. The conservation restriction required by the Town of Mendon is a conservation easement, carrying with it all of the resulting legal sequelae. (*Matter of Necker Pottick, Fox Run Woods Bldrs. Corp. v Duncan,* 251 AD2d 333; *Matter of Morrone v Bennett,* 164 AD2d 887; *Leibring v Planning Bd. of Town of Newfane,* 144 AD2d 903; *Human Dev. Servs. of Port Chester v Zoning Bd. of Appeals of Vil. of Port Chester,* 110 AD2d 135, 67 NY2d 702; *Soon Duck Kim v City of New York,* 90 NY2d 1; *Matter of Doyle v Amster,* 79 NY2d 592; *Matter of Fuhst v Foley,* 45 NY2d 441; *Conley v Town of Brookhaven Zoning Bd. of Appeals,* 40 NY2d 309.) III. The Appellate Division incorrectly effectively reversed the State Supreme Court's holding that a conservation "restriction" of the type sought by the Planning Board of the Town of Mendon legally constitutes an easement. IV. Application of facially un-

constitutional provisions of the Mendon Town Code to Paul and Janet Smith results in violation of the Smiths' constitutionally guaranteed rights. (*Forsyth County, Ga. v Nationalist Movement,* 505 US 123; *Freedman v Maryland,* 380 US 51; *United States v Grace,* 461 US 171; *Southeastern Promotions, Ltd. v Conrad,* 420 US 546; *Ward v Rock Against Racism,* 491 US 781; *City of Lakewood v Plain Dealer Publ. Co.,* 486 US 750; *Regan v Time, Inc.,* 468 US 641; *Simon & Schuster, Inc. v Members of N.Y. State Crime Victims Bd.,* 502 US 105; *Arkansas Writers' Project, Inc. v Ragland,* 481 US 221.) V. Town of Mendon Comprehensive Plan-2015 created a layering of requirements which is inherently discriminatory when applied to owners of property and in particular to owners of property whose ownership and rights flowing therefrom predate the creation of the Plan and which contains an unconstitutionally vague provision relating to "conservation restrictions" (easements). (*McMinn v Town of Oyster Bay,* 66 NY2d 544; *City of Cleburne, Tex. v Cleburne Living Ctr., Inc.,* 473 US 432; *Group House of Port Washington v Board of Zoning & Appeals,* 45 NY2d 266; *City of White Plains v Ferraioli,* 34 NY2d 300; *Huntington Branch, N.A.A.C.P. v Town of Huntington,* 844 F2d 926, 488 US 15.) VI. The Town of Mendon's use of "conservation restrictions" as a condition of final approval of Paul and Janet Smith's application is invalid and unenforceable. (*Nollan v California Coastal Commn.,* 483 US 825; *Dolan v City of Tigard,* 512 US 374; *Reed v Planning Bd. of Town of Chester,* 120 AD2d 510; *Matter of Brucia v Planning Bd. of Town of Huntington,* 157 AD2d 657; *Matter of Massiello v Town Bd. of Town of Lake George,* 257 AD2d 962; *Reed v Planning Bd. of Town of Chester,* 120 AD2d 510; *Matter of Ronsvalle v Blumenthal,* 144 AD2d 766; *Matter of Buckley v Amityville Vil. Clerk,* 264 AD2d 732; *Schneider v State of N.J., Town of Irvington,* 308 US 147; *Metromedia, Inc. v City of San Diego,* 453 US 490.) VII. The Planning Board of the Town of Mendon proceeded improperly to create a condition precedent to approval of Paul and Janet Smith's application and in so doing effected an impermissible, uncompensated taking of the Smiths' property. (*Matter of Chrysler Realty Corp. v Orneck,* 196 AD2d 631; *Matter of Exxon Corp. v Board of Stds. & Appeals,* 128 AD2d 289; *Matter of Mandel v Nusbaum,* 138 AD2d 597; *Matter of Black v Summers,* 151 AD2d 863; *Matter of Stockdale v Hughes,* 189 AD2d 1065; *Matter of Brous v Planning Bd. of Vil. of Southampton,* 191 AD2d 553; *Matter of McDonald's Corp. v Kern,* 260 AD2d 578; *Matter of Swan v Depew,* 167 AD2d 835; *Matter of Greene v Johnson,* 121 AD2d 632; *Matter of Ka-*

dish v Simpson, 55 AD2d 911.) VIII. As a direct result of and inextricably linked to the actions of Town of Mendon, Paul and Janet Smith were denied their constitutionally protected right of equal protection. (*Pitchell v Callan,* 13 F3d 545; *Zahra v Town of Southold,* 48 F3d 674; *LaTrieste Rest. & Cabaret, Inc. v Village of Port Chester,* 40 F3d 587; *Riley v Town of Bethlehem,* 44 F Supp 2d 451; *RR Vil. Assn., Inc. v Denver Sewer Corp.,* 826 F2d 1197; *Soon Duck Kim v City of New York,* 90 NY2d 1.)

*Chamberlain D'Amanda Oppenheimer & Greenfield, LLP,* Rochester (*George D. Marron* and *Sheldon W. Boyce* of counsel), for respondents. I. This appeal should be dismissed for lack of jurisdiction because appellants have failed to state a cause of action for a regulatory taking and, therefore, have failed to raise a substantial constitutional issue as required by CPLR 5601 (b) (1). (*PruneYard Shopping Ctr. v Robins,* 447 US 74; *Spears v Berle,* 48 NY2d 254.) II. The proposed conservation restriction is a conservation easement and a negative easement; but it is not an exaction or dedication for public use of appellants' property. (*Rahabi v Morrison,* 81 AD2d 434; *Huggins v Castle Estates,* 36 NY2d 427; *Nature Conservancy v Congel,* 253 AD2d 248.) III. Appellants' third cause of action was properly denied and dismissed because the Planning Board of the Town of Mendon's grant of conditional final site plan approval is not a regulatory taking. (*Agins v City of Tiburon,* 447 US 255; *Eastern Enters. v Apfel,* 524 US 498; *City of Monterey v Del Monte Dunes at Monterey, Ltd.,* 526 US 687; *Lucas v South Carolina Coastal Council,* 505 US 1003; *Dolan v City of Tigard,* 512 US 374; *Nollan v California Coastal Commn.,* 483 US 825; *Bonnie Briar Syndicate v Town of Mamaroneck,* 94 NY2d 96, 529 US 1094; *Twin Lakes Dev. Corp. v Town of Monroe,* 1 NY3d 98; *Loretto v Teleprompter Manhattan CATV Corp.,* 458 US 419; *de St. Aubin v Flacke,* 68 NY2d 66.) IV. Appellants' second cause of action was properly denied and dismissed because the Planning Board of the Town of Mendon's grant of conditional final approval of Paul and Janet Smith's site plan is not illegal, or arbitrary and capricious as a matter of law. (*Thomas v Brookins,* 175 AD2d 619; *Matter of Green v Planning Bd. of Town of New Castle,* 220 AD2d 415; *Matter of Grogan v Zoning Bd. of Appeals of Town of E. Hampton,* 221 AD2d 441; *Twin Lakes Dev. Corp. v Town of Monroe,* 1 NY3d 98.) V. Appellants' claim for costs and disbursements of this proceeding pursuant to Town Law § 282 was properly dismissed because the claim is without merit. VI. The remainder of appellants' arguments are irrelevant, groundless and lack any merit whatsoever.

*Eliot Spitzer, Attorney General,* Albany (*Caitlin J. Halligan, Daniel Smirlock, Peter H. Lehner, John J. Sipos* and *Susan L. Taylor* of counsel), for State of New York, amicus curiae. I. There is no physical taking of Paul and Janet Smith's property. (*Tahoe-Sierra Preserv. Council, Inc. v Tahoe Regional Planning Agency,* 535 US 302; *Loretto v Teleprompter Manhattan CATV Corp.,* 458 US 419; *Southview Assoc., Ltd. v Bongartz,* 980 F2d 84, 507 US 987.) II. The conservation restriction is not an exaction triggering heightened scrutiny under the Takings Clause. (*City of Monterey v Del Monte Dunes at Monterey, Ltd.,* 526 US 687; *Dolan v City of Tigard,* 512 US 374; *Nollan v California Coastal Commn.,* 483 US 825; *Agins v City of Tiburon,* 447 US 255; *Bonnie Briar Syndicate v Town of Mamaroneck,* 94 NY2d 96, 529 US 1094; *New Port Largo, Inc. v Monroe County,* 95 F3d 1084, 521 US 1121; *Clajon Prod. Corp. v Petera,* 70 F3d 1566; *Villager Pond, Inc. v Town of Darien,* 56 F3d 375, 519 US 808; *Walz v Town of Smithtown,* 46 F3d 162, 515 US 1131; *Matter of Grogan v Zoning Bd. of Appeals of Town of E. Hampton,* 221 AD2d 441, 88 NY2d 919.) III. The proposed conservation restriction is a negative easement. (*Witter v Taggart,* 78 NY2d 234; *Huggins v Castle Estates,* 36 NY2d 427; *Seawall Assoc. v City of New York,* 74 NY2d 92, 493 US 976; *Dolan v City of Tigard,* 512 US 374; *Southview Assoc., Ltd. v Bongartz,* 980 F2d 84; *Loretto v Teleprompter Manhattan CATV Corp.,* 458 US 419; *Penn Cent. Transp. Co. v City of New York,* 438 US 104.) IV. There is no regulatory taking. (*Bonnie Briar Syndicate v Town of Mamaroneck,* 94 NY2d 96; *Agins v City of Tiburon,* 447 US 255; *Penn Cent. Transp. Co. v City of New York,* 438 US 104; *Village of Euclid, Ohio v Ambler Realty Co.,* 272 US 365; *Dittmer v County of Suffolk,* 188 F Supp 2d 286; *Wambat Realty Corp. v State of New York,* 41 NY2d 490; *Spears v Berle,* 48 NY2d 254; *French Inv. Co. v City of New York,* 39 NY2d 587, 429 US 990; *de St. Aubin v Flacke,* 68 NY2d 66; *Lubelle v Rochester Preserv. Bd.,* 158 AD2d 975, 75 NY2d 710.)

*Community Rights Counsel,* Washington, D.C. (*Jason C. Rylander* of counsel), for Association of Towns of the State of New York and others, amici curiae. I. The heightened scrutiny tests of *Nollan v California Coastal Commn.* (483 US 825 [1987]) and *Dolan v City of Tigard* (512 US 374 [1994]) do not apply to development restrictions that do not infringe the landowners' right to exclude others from the property. (*Loretto v Teleprompter Manhattan CATV Corp.,* 458 US 419; *Kaiser Aetna v United States,* 444 US 164; *Lucas v South Carolina Coastal Council,* 505 US 1003; *Yee v City of Escondido,* 503 US 519; *Penn Cent.*

*Transp. Co. v City of New York,* 438 US 104; *Pennsylvania Coal Co. v Mahon,* 260 US 393; *City of Monterey v Del Monte Dunes at Monterey, Ltd.,* 526 US 687; *Bonnie Briar Syndicate v Town of Mamaroneck,* 94 NY2d 96; *Tahoe-Sierra Preserv. Council, Inc. v Tahoe Regional Planning Agency,* 535 US 302.) II. The *Nolan v California Coastal Commn.* (483 US 825 [1987]) and *Dolan v City of Tigard* (512 US 374 [1994]) tests are rooted in the doctrine of unconstitutional conditions and are inapplicable to workaday planning conditions. (*Yee v City of Escondido,* 503 US 519; *Garneau v City of Seattle,* 147 F3d 802; *San Remo Hotel, L.P. v San Francisco City & County,* 364 F3d 1088; *Agins v City of Tiburon,* 447 US 255; *Bonnie Briar Syndicate v Town of Mamaroneck,* 94 NY2d 96.)

## OPINION OF THE COURT

ROSENBLATT, J.

This appeal calls on us to determine whether a municipality commits an unconstitutional taking when it conditions site plan approval on the landowner's acceptance of a development restriction consistent with the municipality's preexisting conservation policy. We hold that it does not.

## I.

Paul and Janet Smith own a 9.7 acre lot in the Town of Mendon. Situated along Honeyoe Creek, a protected waterway, the lot includes several environmentally sensitive parcels, falls within the creek's 100-year floodplain boundary and is located within 500 feet of a protected agricultural district. It also contains a woodlot and steep sloping areas susceptible to erosion. Several portions of the property sit within areas classified as environmental protection overlay districts (EPODs), pursuant to section 200-23 of the Mendon Town Code.

Four separate EPODs limit the Smiths' use of their property. The first, a "Steep Slope" EPOD, bars the construction of new buildings or structures, the clearing of any land area, the installation of sewage disposal systems, the discharge of stormwater and the placement of stormwater runoff systems, and filling, cutting or excavation operations within the designated district. Property owners may acquire development permits for projects within a Steep Slope EPOD if they can show that their proposed activities will not destabilize the soil, cause erosion or unnecessarily destroy ground cover. They must further demonstrate that there is no reasonable alternative for the proposed activity.

The other three EPODs apply to sensitive lands bordering a major creek, an established wooded area and a floodplain. All contain comprehensive use restrictions similar to the Steep Slope EPOD. As a prerequisite for issuance of a development permit, all require specific showings that the proposed activity will not result in injuries to the covered, environmentally sensitive districts.

In December 2001, the Smiths applied to the Town Planning Board for site plan approval to construct a single-family home on the non-EPOD portion of their property. Following various proceedings, the Planning Board issued a final site plan approval in July 2002. The Board concluded that the Smiths' proposal was not likely to result in any adverse environmental impacts as long as no development occurred within the EPOD portions of the site. It conditioned final site plan approval on the Smiths' filing a conservation restriction on any development within the mapped EPODs and amending the final site plan map accordingly. Such action, the Planning Board stated, would "put subsequent buyers on notice that the property contains constraints which may limit development within these environmentally sensitive areas." The Board also determined that the restriction would provide the most meaningful and responsible means of protecting the EPODs.

The conservation restriction sought by the Town closely tracked the limitations set by the EPOD regulations. Under the restriction, which would run with the land and bind subsequent owners, the Smiths would be prohibited in the EPODs from "[c]onstruction, including, but not limited to structures, roads, bridges, drainage facilities, barns, sheds for animals and livestock and fences," the "[c]lear-cutting of trees or removal of vegetation or other ground cover," changing the "natural flow of a stream" or disturbing the stream bed, installing septic or other sewage treatment systems, and using motorized vehicles.

The restriction also required the Smiths to maintain the "Restricted Area" in accordance with the terms of their grant and permitted the Town, upon 30 days' written notice, to enter the property to safeguard the environmentally sensitive parcels. The Smiths, their successors and their assigns, however, retained their rights to "full use and quiet enjoyment" of the EPODs. Critically, they retained the right to exclude others from the entirety of their 10-acre parcel.

The terms of the proposed "Grant of Conservation Restriction" mirrored the preexisting EPOD regulations, differing in

only a few respects. First, the conservation restriction encumbered the servient property in perpetuity, whereas the Town could amend its EPOD ordinance. Under both the EPOD system and the conservation restriction, however, the Smiths could seek permission from the Town to conduct a proscribed activity in the environmentally sensitive parcels. Second, the conservation restriction afforded the Town greater enforcement power. Under the EPOD regime, the Town could only issue citations for violations, whereas with the conservation restriction, it could seek injunctive relief.

Rejecting the proposed conservation restriction, the Smiths commenced this hybrid declaratory judgment/CPLR article 78 proceeding, asserting that the restriction worked an unconstitutional taking.[1] The Town moved for an order dismissing or granting summary judgment against the Smiths' claims. Applying *Dolan v City of Tigard* (512 US 374 [1994]), Supreme Court concluded that, although the conservation restriction was an "exaction," it did not effect an unconstitutional taking. The Smiths appealed.

The Appellate Division determined that Supreme Court erred in characterizing the conservation restriction as an exaction. It affirmed, however, holding that, because the proposed conservation restriction bore a reasonable relationship to the Town's objective of preserving the environmentally sensitive EPODs, there was no taking entitling the Smiths to compensation (*see* 4 AD3d 859 [4th Dept 2004]). The Smiths appeal as of right from the Appellate Division order, and we now affirm.

## II.

The Fifth Amendment to the United States Constitution provides "nor shall private property be taken for public use,

---

1. In addition, the Smiths also sought a judgment declaring that the conservation restriction was, as a matter of law, a conservation easement under ECL 49-0303 (1). They also alleged that the Board's decision to condition final site plan approval on their acceptance of the conservation restriction was arbitrary and capricious, and sought attorneys' fees pursuant to Town Law § 282. That section permits a court to award costs to a person or persons aggrieved by a planning board decision if it "shall appear to the court" that the board "acted with gross negligence or in bad faith or with malice in making the decision appealed from."

without just compensation."[2] Historically, takings jurisprudence involved instances in which the government encroached upon or occupied real property for public use.[3] Beginning with *Pennsylvania Coal Co. v Mahon* (260 US 393 [1922]), the Supreme Court recognized that, even if the government does not seize or occupy a property, a governmental regulation can work a taking if it "goes too far" (*id.* at 415).

In the years following *Mahon*, the Supreme Court offered "some, but not too specific, guidance to courts confronted with deciding whether a particular government action goes too far and effects a regulatory taking" (*Palazzolo*, 533 US at 617). The first and perhaps most critical factor in the Court's takings analyses became whether the regulation deprived landowners of "all economically viable use" of their property.[4]

If the contested regulation falls short of eliminating all economically viable uses of the encumbered property, the Court looks to several factors to determine whether a taking occurred, including "the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action."[5] In a different formulation of this third factor, the Supreme Court held in *Agins v City of Tiburon* (447 US 255, 260 [1980]) that the "application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests" (*see also Bonnie Briar Syndicate v Town of Mamaroneck*, 94 NY2d 96 [1999]).[6]

---

2. The Takings Clause of the Fifth Amendment is applicable to the states through the Fourteenth Amendment (*see Chicago, B. & Q.R. Co. v City of Chicago*, 166 US 226 [1897]).

3. (*See Palazzolo v Rhode Island*, 533 US 606, 617 [2001] [discussing the evolution of takings jurisprudence]; *see also Loretto v Teleprompter Manhattan CATV Corp.*, 458 US 419 [1982].)

4. (*City of Monterey v Del Monte Dunes at Monterey, Ltd.*, 526 US 687, 720 [1999]; *see also Palazzolo*, 533 US at 617; *Lucas v South Carolina Coastal Council*, 505 US 1003, 1019 [1992] ["when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking"].)

5. (*Palazzolo*, 533 US at 617; *see also Penn Cent. Transp. Co. v City of New York*, 438 US 104 [1978].)

6. In spite of their differing language, the Supreme Court has employed the *Agins* test and *Penn Central* standard, which the Court invoked in *Palazzolo*, interchangeably (*see e.g. Lucas v South Carolina Coastal Council*, 505

Styling the conservation restriction an exaction, the Smiths argue that we should not review the Town's action under the *Penn Central/Agins* standard. We disagree. Exactions are defined as "land-use decisions conditioning approval of development on the *dedication of property to public use*" (*City of Monterey v Del Monte Dunes at Monterey, Ltd.*, 526 US 687, 702 [1999] [emphasis added]). In a narrow, readily distinguishable class of cases, the Court has held such conditions unconstitutional.

In *Nollan v California Coastal Commn.* (483 US 825 [1987]), the Court considered whether conditioning a development permit on the property owners' transfer to the public of an easement across their beachfront violated the Takings Clause. The Court deemed the condition unconstitutional because it lacked an "essential nexus" (*id.* at 837) with the stated purpose of the underlying land-use restriction—"protecting the public's ability to see the beach, assisting the public in overcoming the 'psychological barrier' to using the beach created by a developed shorefront, and preventing congestion on the public beaches" (*id.* at 835). Nevertheless, the Court noted that the government could have conditioned the grant of a development permit on restrictions that promoted the public's ability to see and psychologically access the beach, such as height limitations, width restrictions, and the like (*id.* at 836).

In *Dolan v City of Tigard* (512 US 374 [1994]), the Supreme Court added a second layer to the "essential nexus" test— "rough proportionality." In *Dolan*, the municipality conditioned approval of a building permit on the landowner's dedication of, first, a portion of her property lying within a 100-year floodplain for improvements to a storm drainage system and, second, a strip of land adjacent to the floodplain for use as a pedestrian and bicycle path. The Court concluded that an essential nexus existed between these development conditions and a legitimate governmental purpose, but nevertheless determined that the municipality's proposed exactions were impermissible under a "rough proportionality" standard (*id.* at 391).

A showing of rough proportionality, the Court ruled, requires a municipality to "make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development" (*id.*). A "precise mathematical calculation" is not required (*id.*). The

US 1003, 1024 [1992]; *Keystone Bituminous Coal Assn. v DeBenedictis*, 480 US 470, 485 [1987]).

exactions at issue were not roughly proportional, the *Dolan* court reasoned, because the municipality had failed to meet its burden of showing the impact of the proposed construction on its flood and traffic abatement efforts. The Court stressed, however, that the municipality could, for instance, have conditioned the grant of a development permit on the transfer of a pedestrian/bicycle pathway easement if it had made "some effort to quantify its findings" that the construction would generate more traffic (*id.* at 395). In other words, a municipality could place otherwise unconstitutional conditions on the issuance of a regulatory permit if the condition furthered the purpose of the underlying development restriction and there was a rough proportionality between the condition and the impact of the proposed development.

With *City of Monterey v Del Monte Dunes at Monterey, Ltd.* (526 US 687, 702 [1999]), the Court placed a key limitation on *Dolan*, indicating that the "rough proportionality" test did not apply beyond the special context of exactions. The Court added that the test was not "designed to address, and is not readily applicable to" a case in which the landowner's challenge is based on denial of development, as opposed to excessive exactions (*id.* at 703).

## III.

The Attorney General has submitted an amicus brief arguing for affirmance, cogently pointing out that the present case involves efforts by the Town of Mendon to protect environmentally sensitive lands by means of a "do-no-harm" restriction that involves no property dedication of the type encountered in *Nollan* and *Dolan*. We agree. Under the Supreme Court's doctrinal framework, the Appellate Division correctly determined that the Town's conservation restriction was not an "exaction" subject to the closer scrutiny of the *Dolan* test.[7] In *City of Monterey* (526 US at 702), the Court observed that an exaction involves the conditioning of a land-use decision on the "dedication of *property* to public use" (emphasis added).

There is no such dedication of "property" here. In practice, the Court has identified exactions in only two real property cases, *Nollan* and *Dolan*, both of which involved the transfer of

---

7. Because the Town's conservation restriction cannot be classified as an exaction, we need not address the question whether it was roughly proportional to the impact of the development proposed by the Smiths.

the most important "stick" in the proverbial bundle of property rights, the right to exclude others.[8] In *Twin Lakes Dev. Corp. v Town of Monroe* (1 NY3d 98 [2003]), we also characterized a fee imposed in lieu of the physical dedication of property to public use as an exaction. Outside of these two narrow contexts, neither the Supreme Court nor this Court has classified more modest conditions on development permits as exactions. Thus, we decline the Smiths' invitation to extend the concept of exaction where there is no dedication of property to public use and the restriction merely places conditions on development.

The Smiths argue that by its conservation restriction the Town is requiring them to surrender the right to seek a variance under the particular procedures of the EPOD regime. On the record before us, we are not persuaded that this can properly be characterized as the relinquishment of a property right. If it is a property right, however, it is trifling compared to the rights to exclude or alienate.[9] Under the "Grant of Conservation Restriction," the Smiths could still apply to the Town for permission to conduct prohibited activities within the "Restricted Area."

Under the circumstances of this case, the difference between the Smiths' rights under the EPOD ordinance and the conservation restriction is subtle: section 200-23 of the Mendon Town Code affords the Planning Board wide discretion in granting

---

**8.** Judge Read suggests that the conservation restriction here somehow encumbers the right to exclude because it permits town inspectors to enter the property on 30 days' written notice or in the event of an emergency threatening the public's health, safety or welfare (*see* Read, J., dissenting op at 23). On the facts of this case, we fail to see how the Town's right to enter the Smiths' land under a sharply circumscribed set of circumstances to enforce a set of valid regulations impairs the right to exclude or represents a departure from the Town's ordinary exercise of its police powers.

**9.** Although the conservation restriction may, as Judge Read suggests, require the dedication of a possessory interest (*see* Read, J., dissenting op at 19-20), "property" is constituted by many possessory interests, some of which (e.g., the rights to exclude and alienate) are more central to commonly held understandings of property than others. The Supreme Court's exactions jurisprudence tracks this conception of property. In *Nollan* and *Dolan*, the Supreme Court applied the idea of "exaction" only to the required dedications of a core possessory interest, the right to exclude. As the Attorney General observes, "[b]oth cases hinged on the owners' loss of perhaps the most important 'stick' from the ownership bundle: the ability to restrict access" (Attorney General's brief at 12-13). Notably, the Supreme Court has *never* extended its exactions analysis to the dedication of less substantial possessory interests, like those at issue here. Thus, the Appellate Division correctly determined that the conservation restriction is not an exaction within *Nollan* and *Dolan*, and we are unwilling to expand the holdings of those decisions to the case before us.

development permits within EPODs; by contrast, under the proposed conservation restriction, the Board would have essentially unfettered discretion to grant or deny such permits. The right to seek a variance from a planning board that enjoys broad, as opposed to unmitigated, discretion may be among the more modest and fragile twigs in the bundle of property rights, if it is a property right at all. To be sure, conditioning a development permit on its surrender should not trigger the same constitutional scrutiny as the regulatory extortion of sticks far more integral to the bundle, such as the right to exclude third persons (a right the Smiths fully retain).[10]

## IV.

Because the Town's development condition is not an exaction, we review it according to the standard enunciated by the Court in *Agins v City of Tiburon* (447 US 255 [1980]; *see also Penn Cent. Transp. Co. v City of New York*, 438 US 104 [1978]), as opposed to *Dolan*'s rough proportionality test. Examined in this light, the conservation restriction does not effect an unconstitutional taking.

First, the restriction would not appreciably diminish the value of the Smiths' property, let alone deny them economically viable use of it—as demanded by *Agins* (447 US at 260).[11] In exchange for their acceptance of the restriction, the Smiths would garner a permit to construct a single-family home on their property.[12] A single dwelling on a protected, 10-acre parcel is a valuable, mar-

---

**10.** Judge Read mistakenly argues that there is something extraordinary or improper about the Town's exercise of its police powers here. We disagree. The case before us today concerns only a marginal use restriction superimposed over a wholly legitimate, preexisting EPOD ordinance. There is nothing here that implicates the Fifth Amendment's concern with "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole" (*Armstrong v United States*, 364 US 40, 49 [1960]).

**11.** (*See also Lucas v South Carolina Coastal Council*, 505 US 1003 [1992] [holding that a deprivation of "all" economically viable uses of a property works a taking].)

**12.** We note that the Supreme Court has been reluctant to engage in spatial "conceptual severance" in determining whether a regulation or government action deprives a property owner of all economically viable uses of the property (*District Intown Props. Ltd. Partnership v District of Columbia*, 198 F3d 874, 887 [DC Cir 1999]). Hence, we look to the effect of the government action on the value of the property *as a whole*, rather than to its effect on discrete segments of the property (*see Penn Cent. Transp. Co. v City of New York*, 438 US 104, 130-131 [1978] [" 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether

ketable asset. Indeed, it is not clear that the conservation re-
striction would have *any* effect whatsoever on the market value
of the Smiths' property. Given the development bar created by
the preexisting EPOD ordinance, the legitimacy of which the
Smiths do not challenge, the encumbered parts of the property
had almost no developmental value before the Town announced
the conservation restriction. Second, the conservation restric-
tion substantially advances a legitimate government purpose—
environmental preservation. As we indicated in *Bonnie Briar
Syndicate, Inc. v Town of Mamaroneck* (94 NY2d 96, 108 [1999]),
a regulatory action need only be reasonably related to a legiti-
mate governmental purpose to satisfy the "substantially
advance" standard.[13] Such a relationship undeniably exists here.
The conservation restriction will advance the Town's aim of
preserving environmentally sensitive areas in perpetuity, place
future buyers on notice of the development limitations on the
Smiths' property and furnish the Town with a more effective
means of ensuring compliance with its regulatory objectives. In
all, and in keeping with preexisting conservation policies, the
restriction merely gives the Town the power to interdict harm-
ful activities within the EPODs on the Smiths' parcel.

In dissent, Judge Graffeo argues that the conservation re-
striction effects a taking under *Agins* because, in her view, it ad-
vances the Town's interests only marginally, if at all. We dis-
agree. Ensuring perpetual protection for open spaces—along
with the resources and habitats they shelter—from the vicis-
situdes of workaday land-use battles is hardly an inconsequential
governmental interest. At the very least, the permanent
character of the conservation restriction will spare the Town
the administrative cost of continually being forced to maintain
its conservation policies. More importantly, as the Attorney

a particular governmental action has effected a taking, this Court focuses
rather both on the character of the action and on the nature and extent of the
interference with rights in the parcel as a whole"]; *see also Keystone
Bituminous Coal Assn. v DeBenedictis*, 480 US 470, 497 [1987]). Here, the
conservation restriction, while reinforcing the preexisting devaluation of a
portion of the Smiths' property, does not begin to deny them all economically
viable uses of the entire parcel.

**13.** (*See also City of Monterey v Del Monte Dunes at Monterey, Ltd.*, 526
US 687, 701, 721 [1999] [observing that the trial court correctly instructed the
jury that "substantially advances" was equivalent to "reasonable relation-
ship"]; *Hotel & Motel Assn. of Oakland v City of Oakland*, 344 F3d 959, 968
[9th Cir 2003] ["A reasonable relationship exists between this regulatory ac-
tion and the public purpose it is meant to serve. Thus, the ordinance
substantially advances a legitimate government interest."].)

General observes, the conservation restriction imposed by the Town, as a species of negative easement (*see Huggins v Castle Estates, Inc.*, 36 NY2d 427, 430 [1975]), is a "well established land use tool" that is "consistent with the State's longstanding commitment to protecting . . . critical natural resources" (Attorney General's brief at 2). Further, even assuming that the marginal benefit to the Town from the conservation restriction were, as Judge Graffeo suggests, modest, it would nonetheless be legitimate. Under the holdings of *Agins*, *Penn Central* and their progeny, a modest environmental advancement at a negligible cost to the landowner does not amount to a regulatory taking. The Smiths' other claims are without merit.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

READ, J. (dissenting). Today the majority decides that the Fifth Amendment takings analysis of *Nollan v California Coastal Commn.* (483 US 825 [1987]) and *Dolan v City of Tigard* (512 US 374 [1994]) does not apply to a permit condition compelling dedication of a conservation easement. Because these decisions do not admit of this result, I respectfully dissent.

I.

The eminent domain provision of the United States Constitution, the Takings Clause of the Fifth Amendment, provides that "private property [shall not] be taken for public use, without just compensation." The Fourteenth Amendment makes this constitutional guarantee applicable to the states (*see Penn Cent. Transp. Co. v City of New York*, 438 US 104, 122 [1978], citing *Chicago, B. & Q.R. Co. v City of Chicago*, 166 US 226, 239 [1897]).

In *Pennsylvania Coal Co. v Mahon* (260 US 393 [1922]), Justice Holmes acknowledged the difficulty of distinguishing a proper exercise of police power from a compensable taking: "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law" (*id.* at 413); and "[t]he general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking" (*id.* at 415). Thus was born the concept at the heart of this appeal—the regulatory takings doctrine—which recognizes that government's exercise of the police power to regulate private property, when it goes "too far," so impairs

property interests that the Fifth Amendment mandates just compensation notwithstanding the absence of outright appropriation.

When revisiting regulatory takings some 50 years later in *Penn Central*, Justice Brennan remarked that deciding whether a regulation had gone "too far" eluded ready systemization:

> "[T]his Court, quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons. Indeed, we have frequently observed that whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely 'upon the particular circumstances [in that] case'" (*Penn Cent.*, 438 US at 124 [citations omitted]).

He listed three factors bearing with "particular significance" on "these essentially ad hoc, factual inquiries": the regulation's economic impact on the claimant; the extent to which the regulation interferes with the claimant's "distinct, investment-backed expectations"; and the character of the governmental action (*id.*). In short, the Court devised a balancing test.

Two years later when considering a facial challenge to a municipal zoning ordinance, however, the Court in *Agins v City of Tiburon* (447 US 255 [1980]) condensed and reformulated the *Penn Central* factors into something akin to a test: "[t]he application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests [i.e., the character of the governmental action], or denies an owner economically viable use of his land [i.e., the regulation's economic impact on the claimant and the extent of interference with distinct, investment-backed expectations]" (*id.* at 260 [citation omitted]). After devising this general rule for determining when a taking has occurred, the Court marched down another path, handing down several landmark cases that carved out from the ambit of *Penn Central/Agins* specific rules for analyzing three different kinds of regulatory takings.

In *Loretto v Teleprompter Manhattan CATV Corp.* (458 US 419 [1982]), the landlord purchased an apartment building in which the prior owner had allowed a cable company to install a

cable on the building and to furnish cable television services to the building's tenants, as mandated by state law. The landlord filed a class action alleging that the installation—which, at most, occupied only $1^{1}/_{2}$ cubic feet of the landlord's property—was a trespass and a taking without just compensation. The Court held that even this minuscule physical invasion required compensation regardless of an adequate public purpose (*see also Kaiser Aetna v United States*, 444 US 164 [1979] [government's imposition of navigational servitude upon a private marina is a physical invasion for which just compensation must be paid]). Thus, a regulation effecting an actual permanent physical occupation of or intrusion on an owner's land or building constitutes a per se regulatory taking.

In *Lucas v South Carolina Coastal Council* (505 US 1003 [1992]), the Court considered the effect of a coastal protection statute that barred a landowner from building any permanent habitable structures on two beach parcels for which he had paid $1 million, intending to build one home for himself and one for sale. The Court determined that this was the "rare" case where a regulation denies a landowner *all* economically beneficial use of his property, and therefore was a per se total regulatory taking unless the state could prove that the regulation, as applied, would prevent a nuisance or was part of the state's background principles of property law.

In addition to the per se rules for physical takings and total takings, the Court also devised a non-per se rule for analyzing whether a taking has occurred in those situations where the government seeks to require a concession or "exaction" as a condition for approval of a land-use permit. This is the so-called *Nollan/Dolan* rule, which, in my view, so plainly calls for reversal in this case.

The landowners in *Nollan* planned to demolish a dilapidated bungalow on their beachfront property and replace it with a three-bedroom house. They sought the required discretionary permit from the California Coastal Commission, which granted it subject to the Nollans' dedication of an easement running across their property laterally to the shore. This easement would provide a beachfront passageway connecting the two public beaches flanking the Nollans' property. The Commission justified the easement on the grounds that the Nollans' larger house would obstruct the public's visual access to the beach, increase private use of the beach and burden the public's ability to traverse to and along the shorefront.

Justice Scalia observed at the outset that "[h]ad California simply required the Nollans to make an easement across their beachfront available to the public on a permanent basis in order to increase public access to the beach, rather than conditioning their permit to rebuild their house on their agreeing to do so, we have no doubt there would have been a taking" (483 US at 831). The Court held that while a permit condition that substantially advances a legitimate state interest is constitutionally permissible,[1] this particular condition violated the Takings Clause because there was no "essential nexus" between the easement and the harm created by the proposed development (id. at 837).

This point is well-illustrated by Justice Scalia's description of the kind of easement that would have been sufficiently closely linked to the loss of visual access caused by the house's construction to pass muster under the "essential nexus" test:

> "Moreover (and here we come closer to the facts of the present [Nollan] case), the condition would be constitutional even if it consisted of the requirement that the Nollans provide a viewing spot on [the Nollans'] property for passersby with whose sighting of the ocean their new house would interfere. Although such a requirement, constituting a permanent grant of continuous access to the property, would have to be considered a taking if it were not attached to a development permit, the Commission's assumed power to forbid construction of the house in order to protect the public's view of the beach must surely include the power to condition construction upon some concession by the owner, even a concession of property rights, that serves the same end. If a prohibition designed to accomplish that purpose would be a legitimate exercise of the police power rather than a taking, it would be strange to conclude that providing the owner an alternative to that prohibition which accomplishes the same purpose is not" (id. at 836-837).

In Dolan, the Court addressed how much of an exaction the government could require without running afoul of the Takings

---

1. The Court "assume[d] without deciding" that the purposes proffered by the Commission to justify the exaction—"protecting the public's ability to see the beach, assisting the public in overcoming the 'psychological barrier' to using the beach created by a developed shorefront, and preventing congestion on the public beaches"—were legitimate state interests (483 US at 835).

Clause, an issue it did not reach in *Nollan* because there the "essential nexus" was lacking. The property owner in *Dolan* sought to raze and rebuild her plumbing and electrical supply store. When she applied for site development review, the city required her as a condition of approval to dedicate a portion of her property to the city for a greenway and expanded storm drain channel and for a pedestrian/bicycle pathway to be built at her expense.

The Court first determined that flood prevention along the creek and the reduction of traffic in the business district "qualify as the type of legitimate public purposes [the Court has] upheld" (512 US at 387 [citing *Agins*]). Then the Court determined that there was an "essential nexus" between the exactions and the harm created by the development; namely, the flood plain dedication was related to mitigating the extra stormwater runoff anticipated from the additional building and paving projects associated with the expansion, and the pathway was related to the increased traffic that might be expected from customers patronizing the larger store. These exactions were nonetheless constitutionally impermissible without just compensation because they lacked the "rough proportionality" required "both in nature and extent to the impact of the proposed development" (512 US at 391). Specifically, the city was unable to say "why a public greenway, as opposed to a private one, was required in the interest of flood control" (*id.* at 393). With respect to the pedestrian/bicycle pathway, the city failed to meet "its burden of demonstrating that the additional number of vehicle and bicycle trips generated by [the] development reasonably relate to the city's requirement for a dedication of the pedestrian/bicycle pathway easement"; the city had simply made a conclusory finding that "the creation of the pathway 'could offset some of the traffic demand . . . and lessen the increase in traffic congestion' " (*id.* at 395).

## II.

The "development restriction" (majority op at 6) at issue in this case is a conservation easement within the meaning of the Environmental Conservation Law (*see* ECL 49-0301—49-0311). Both the Town of Mendon and amicus State of New York concede as much. A conservation easement is a nonpossessory "interest in real property" (ECL 49-0303 [1]), which imposes use restrictions on the landowner for purposes generally of "conserving, preserving and protecting" the State's "environ-

mental assets and natural and man-made resources'' for the benefit of the public (ECL 49-0301). The majority is therefore simply wrong when it asserts that the Town is not requiring a dedication of property to public use by mandating that the Smiths grant it a conservation easement, which is perpetual in duration, runs with the land and is recorded.

Nor is it relevant (or even certain) that this particular conservation easement may be worth little. The Town is compelling the Smiths to convey an interest in real property that the Town would otherwise have to pay for, or which the Smiths might choose to donate for whatever tax advantages they would enjoy as a result.[2] And of course, the arguably trivial value of this particular conservation easement is of no comfort to the next landowner who seeks a development permit from the government only to be met with a demand for what might be a very valuable conservation easement as a condition of approval. As we must always be aware, we are establishing the rule that will govern not just this case, but future cases.

The majority takes the view that a permit condition is not an ''exaction'' unless it infringes on the property owner's right to exclude others and/or mandates public access.[3] Black's Law Dictionary defines an ''exaction'' as ''1. The act of demanding more

---

**2.** Section 170 (h) of the Internal Revenue Code (26 USC) provides for a charitable deduction for a qualifying conservation easement. The easement must be contributed to a public body or qualified nonprofit organization exclusively for conservation purposes to be protected in perpetuity (26 CFR 1.170A-14 [a], [b] [2]; [c]). Depending upon the nature of the easement's conservation purposes, public access may be mandated, or it may be partially or wholly restricted (see e.g. 26 CFR 1.170A-14 [d] [2] [ii] [public access required for conservation easement for recreation and education]; [d] [3] [iii] [restrictions on public access to protected environmental systems]; [d] [4] [ii] [B] [visual rather than physical access sufficient to satisfy requirement of scenic enjoyment of open space by general public]). Section 2031 (c) of the Internal Revenue Code grants substantial estate tax benefits to a qualifying conservation easement. In addition, the restrictions placed on property by a conservation easement may reduce market value so as, in turn, to reduce assessed value and therefore real property taxes. As one commentator has noted, however, ''local assessors are often reluctant to reduce assessments'' on account of conservation easements and ''[i]n many instances the cost of pursuing legal remedies may exceed the potential benefits of the possible tax reduction'' (Ginsberg and Weinberg, Environmental Law and Regulation in New York § 12:6, at 1081, 1082 [9 West's NY Prac Series 2001]).

**3.** In essence, the majority has adopted the positions advocated by amicus State of New York and the Town. The State argues that an exaction is limited to a physical taking or a physical invasion. Likewise, the Town argues that an easement is not an exaction unless it provides for the general public's or the Town's physical use or occupation of the property. In a related vein, both

money than is due; extortion. 2. A fee, reward, or other compensation arbitrarily or wrongfully demanded" (Black's Law Dictionary 600 [8th ed 2004]). More colloquially, an exaction is "something exacted"; that which is "call[ed] for forcibly or urgently and obtain[ed]" (Merriam-Webster's Collegiate Dictionary 403 [10th ed 1996]). Indeed, the majority seems to derive the notion that public access is the sine qua non for an exaction not from any commonly accepted definition, but from a gloss on dictum in the Supreme Court's decision in *City of Monterey v Del Monte Dunes at Monterey, Ltd.* (526 US 687 [1999]).

*Monterey* concerned a developer seeking to build an oceanfront multi-unit residential complex in an area zoned for this use. The developer repeatedly scaled back and revised its plans over the course of several years at the instance of local authorities. When the city planning commission and the city council ultimately rejected the site plan, the developer brought a 42 USC § 1983 action in federal District Court, alleging, among other things, that the permit denial was an unconstitutional taking. A jury delivered a general verdict for the developer on its takings claim and awarded damages of $1.45 million. The Ninth Circuit determined that the developer's inverse condemnation claim was triable to a jury and upheld the verdict.

The city's petition for certiorari presented multiple questions to the Supreme Court, including whether the Ninth Circuit erred in assuming that the rough-proportionality standard of *Nollan/Dolan* applied. On this question, all the Justices agreed that heightened scrutiny under *Nollan/Dolan* applies only to exactions and does not extend to decisions to deny applications for discretionary approvals. Specifically, Justice Kennedy commented that "we have not extended the rough-proportionality test of *Dolan* beyond the special context of exactions—land-use decisions conditioning approval of development on the dedication of property to public use" (526 US at 702). The majority here, in relying on this language, underscores the words "dedication of property to public use," but the key word is "conditioning." The Court distinguished *Dolan* and *Nollan* from

---

the State and the Town emphasize that the conservation easement here is a negative easement that prohibits the landowner from doing something otherwise lawful on his estate. Of course, to the extent that the easement mirrors the Town's environmental protection overlay district (EPOD) regulations, the easement only prohibits the Smiths from doing that which the law now already bans. The Town takes the position that a negative easement may never be an exaction while an affirmative easement, which grants the easement holder the right to use the servient estate, may be.

*Monterey* because in the former cases, a development permit was conditioned on a land use restriction, while in the latter there was no conditioning—the permit was denied. In this case, site plan approval was conditioned upon the granting of a conservation easement. That is an exaction.

Nonetheless, the majority views the quoted language from *Monterey* as having limited the *Nollan/Dolan* rule to those land dedications that entail public access or otherwise restrict the landowner's right to exclude.[4] First, of course, the phrase "public use" does not unambiguously equate with public access. Indeed, in takings jurisprudence "public use" has come to mean something more akin to a public purpose or public benefit.[5] As already discussed, this conservation easement is, in fact, a dedication of property to public use. Its whole justification and

---

4. The language's author, Justice Kennedy, does not appear to agree with this interpretation of what he wrote. In *Lambert v City & County of San Francisco* (529 US 1045 [2000]), he and Justice Thomas joined Justice Scalia's dissent from a denial of certiorari to consider whether *Nollan/Dolan* applies to the denial of a permit because an exaction is not met. In this case, the exaction was a replacement fee for conversion of apartments. Justice Scalia summarized the holdings in *Nollan/Dolan* as follows, making no reference whatsoever to public access: These decisions "held that a burden imposed as a condition of permit approval must be related to the public harm that would justify denying the permit, and must be roughly proportional to what is needed to eliminate that harm" (529 US at 1046). Further, in *Ehrlich v City of Culver City* (512 US 1231 [1994]), handed down three days after *Dolan,* the Court by a 5-4 margin vacated the judgment and remanded for further consideration in light of *Dolan.* In *Ehrlich,* the owner of a sports complex required the City's approval to construct a condominium on the site to replace the sports complex. The City conditioned approval upon the property owner/developer's payment of a recreational fee and a fee in lieu of participating in the City's "Art in Public Places Program." Upon remand, the California Supreme Court specifically "reject[ed] the city's contention that the heightened takings clause standard formulated by the court in *Nollan* and *Dolan* applies *only* to cases in which the local land use authority requires the developer to dedicate real property to public use as a condition of permit approval" (12 Cal 4th 854, 859, 911 P2d 429, 433 [1996], *cert denied* 519 US 929 [1996]).

5. As the eminent constitutional scholar Cass Sunstein has succinctly explained: "For a long period, the public use requirement [of the Takings Clause] was understood to mean that if property was to be taken, it was necessary that it be used by the public. That the new use was in some sense beneficial to the public was insufficient. Eventually, however, it became clear that this test was unduly mechanical, for a wide range of uses by government served the public at large, even if the public did not actually have access to the property. The Mill Acts, which permitted riparian owners to erect and maintain mills on neighboring property, provided an example. After the courts upheld those acts, exceptions were built into the general rule until the general rule itself was abandoned" (Sunstein, *Naked Preferences and the Constitution,* 84 Colum L Rev 1689, 1724 [1984]).

purpose is to confer an environmental benefit on the public at large. Further, while the Smiths retain the right to exclude the general public from the easement area, the Town may enter this area upon 30 days' notice to enforce the easement, and may enter without any notice at all in the event of a self-proclaimed emergency threatening the public health, safety and general welfare.

Second, the language in *Monterey* on which the majority so heavily relies is more properly read as merely an acknowledgment of the nature of the exactions at issue in *Nollan* and *Dolan* rather than a limitation of the Court's *Nollan/Dolan* analysis to exactions that are land dedications. Certainly there was no discussion in either *Nollan* or *Dolan* to indicate that the Court viewed its exaction analysis as so limited. If the Court had only intended for *Nollan/Dolan* to create an exception from the per se *Loretto* rule for those physical takings that are permit conditions, it could have and surely would have said this directly.

Further, before today we have never read *Nollan/Dolan* so narrowly (*see e.g. Manocherian v Lenox Hill Hosp.*, 84 NY2d 385 [1994] [pre-*Monterey* case applying *Nollan/Dolan* to assess the validity of a statute imposing occupancy restrictions on apartment building owners]), or viewed it as subsequently limited by *Monterey* to infringement of a property owner's right to exclude. The majority explains our decision just last year in *Twin Lakes Dev. Corp. v Town of Monroe* (1 NY3d 98 [2003]) as consistent with its decision today on the ground that the per-lot recreation fees at issue there were paid *in lieu of* dedication of property to public use. In *Twin Lakes*, the parties agreed that *Nollan/Dolan* applied to the exaction, but there is no indication that any concession on this point or our acquiescence to it hinged on the fact that the fees were exacted in lieu of a land dedication. Impact fees such as the per-lot recreation fee in *Twin Lakes*—charges in consideration of a development's anticipated impacts on a community's infrastructure and amenities, with the fees used to mitigate these impacts—are often imposed as a condition for development approvals. Does the majority mean to suggest that such a fee is not an exaction for purposes of takings analysis unless it is paid specifically in lieu of a land dedication? I would guess that such a turn of events might greatly surprise localities and developers throughout the state, but it seems to be the clear implication of today's decision.

## III.

As I understand the Supreme Court's takings jurisprudence—through which I took a Cook's tour at the beginning of this dissent—we are called upon first to decide whether a claimed regulatory taking falls within either of the categorical or per se rules (the *Loretto* rule for physical takings and the *Lucas* rule for total takings) or is a permit condition (*Nollan/Dolan*). For those claimed takings outside the scope of these three rules, *Penn Central/Agins* provides a default approach.[6] Here, the Smiths sought site plan approval to build a single-family house, and the Town conditioned its approval on the Smiths' grant of a conservation easement to the Town covering those portions of their 9.7-acre parcel within the Town's EPODs. As a result, this case falls squarely within *Nollan/Dolan*.

The reason proffered by the Town to justify the easement is the "desire[ ] that certain portions of the [Smiths'] property remain in their natural state in order to preserve such environmentally significant areas." In my view, this is a legitimate town interest that the conservation easement would promote. As was the case in *Nollan,* however, there is no "essential nexus" between this exaction and the harm created by the proposed development. The "proposed development" here was merely the construction of a single-family house on land *not* within an EPOD, and there is no suggestion in the record that it would create any significant environmental harm. On this appeal, the Town argues merely that there is a "clear essential nexus between requiring a conservation restriction and the legitimate town interest of protecting environmentally sensitive areas in Mendon." But for purposes of *Nollan/Dolan* analysis, this is (as I already indicated) merely a necessary but not a sufficient predicate for the Town to establish that it may require the conservation easement without making just compensation. The Smiths' house does not encroach on the EPODs; it simply happens to be located on the same parcel of property. There has been no showing of any relationship whatsoever between the construction or occupancy of the Smiths' house and any environmental harm to the EPODs that the conservation easement would mitigate. As Justice Scalia has remarked, "[t]he object of the Court's holding in *Nollan* and *Dolan* was to protect

---

**6.** In this respect, I undertake the analysis in a reverse order than does Judge Graffeo except, of course, to the extent that the first question under *Nollan/Dolan* is whether the permit seeks to promote a legitimate state purpose, which derives from *Agins.*

against the State's cloaking within the permit process an out-and-out plan of extortion" (*Lambert*, 529 US at 1048, quoting *Nollan*, 483 US at 837 [internal quotation marks and citation omitted]). That the extortion may be somewhat gratuitous in this case—the Town's EPOD regulations are currently at least as restrictive as the terms of the conservation easement—renders the extortion no less out of bounds.

Quoting the Attorney General, the majority correctly points out that conservation easements have proven to be a very popular and flexible tool for preserving land and protecting our state's environment.[7] I have found nothing to suggest, however, that the State has heretofore ever been the beneficiary of a conservation easement which was neither purchased[8] nor donated. As a result of today's decision, the State and localities may compel conveyance of conservation easements as a condition for issuance of all sorts of routine permits, and, for purposes of determining whether just compensation is due, these conditions will not be subject to the heightened scrutiny of *Nollan/Dolan*. This will no doubt come as unexpected and unwelcome news to many New York property owners.

GRAFFEO, J. (dissenting). We do not need to decide whether heightened scrutiny under *Dolan v City of Tigard* (512 US 374 [1994]) applies to the facts of this case because I believe the Town of Mendon's action effected a taking even under the standard articulated in *Agins v City of Tiburon* (447 US 255 [1980]). Additionally, because the condition imposed by the Town was not necessary to mitigate any demonstrable effects of the site plan proposal, I conclude the Town's determination was arbitrary and capricious. I therefore respectfully dissent.

Paul and Janet Smith are the owners of 9.7 acres of undeveloped land that was part of a larger parcel owned by Paul's family for over 50 years. Portions of their land lie within four of the Town of Mendon's environmental protection overlay districts (EPODs) under Mendon Town Code § 200-23. The Town Code's

---

7. There are, however, those who view the merits of conservation easements more skeptically (*see e.g.* Mahoney, *Perpetual Restrictions on Land and the Problem of the Future*, 88 Va L Rev 739 [2002]).

8. Moneys have been expended from the 1986 bond act, the New York State Open Space Plan and the environmental protection fund to purchase conservation easements (*see* Bathrick, Symposium: 25th Anniversary of the New York State Department of Environmental Conservation: Past and Future Challenges and Directions, *Resource Management: Lands & Forests*, 7 Alb LJ Sci & Tech 159, 167 [1996]).

EPOD regulations place severe restrictions on activities that may occur in EPODs, and development in EPODs is prohibited unless the landowner first applies for and obtains a special development permit from the Town. The Smiths sought approval to build a single-family home on their parcel. Although construction of the Smiths' proposed home would not encroach on any of these EPODs, the Town granted approval of the site plan only on condition that the Smiths agree to file a conservation restriction affecting the EPODs. The restriction in large part mirrors the regulations already imposed under the EPOD ordinance but provides that it will exist in perpetuity. The Town reasoned that such a restriction "will provide the most meaningful and responsible means of protecting the environmental resources" located in the EPOD portions of the Smiths' lot.

The issue before us is whether the Town's imposition of the development restriction as a condition to granting site plan approval effects a regulatory taking under the Fifth and Fourteenth Amendments to the United States Constitution. Under *Agins*, a regulatory action may effect a taking where it "does not substantially advance legitimate state interests" (*Agins*, 447 US at 260). Put another way, "a use restriction on real property may constitute a 'taking' if not reasonably necessary to the effectuation of a substantial public purpose" (*Penn Cent. Transp. Co. v City of New York*, 438 US 104, 127 [1978]). Although it has been intimated that the regulatory action need only bear a reasonable relationship to a legitimate governmental purpose (*see City of Monterey v Del Monte Dunes at Monterey, Ltd.*, 526 US 687, 701, 721 [1999]), the United States Supreme Court has rejected the notion that the "substantially advance" standard simply means that "the State *could rationally have decided* that the measure adopted might achieve the State's objective" (*Nollan v California Coastal Commn.*, 483 US 825, 834 n 3 [1987] [citations and internal quotation marks omitted]). Furthermore, it has long been established that the issue of whether a taking has occurred "depends largely 'upon the particular circumstances [in that] case' " (*Penn Cent.*, 438 US at 124, quoting *United States v Central Eureka Min. Co.*, 357 US 155, 168 [1958]).

The Town proffers three reasons why the restriction substantially promotes its valid goal of preserving the environment. I cannot conclude that the reasons offered by the Town substantially or even reasonably further legitimate governmental interests not already protected by the existing EPOD regulations.

First, the Town claims that the conservation restriction, which is to be filed similar to a deed, "is intended to put subsequent buyers on notice that the property contains constraints which may limit development within these environmentally sensitive areas of the site." Pursuant to the Town's EPOD regulations, however, the locations of all EPOD sites within the Town are delineated on an official set of maps on file with the Town. Subsequent purchasers are therefore already on constructive notice that the Smiths' property contains EPODs and is subject to the limitations currently in place pursuant to the Town Code, which the proposed conservation restriction largely follows. Hence, the restriction does not in any meaningful way advance a necessary public notice purpose.

Second, the Town asserts that the conservation restriction strengthens the available enforcement mechanisms, particularly the ability of the Town to seek injunctive relief. Even without the restriction, it is well settled that the Town could seek to enjoin any activity on the property which is violative of land-use regulations (*see* Town Law § 268 [2]; *Town of Throop v Leema Gravel Beds*, 249 AD2d 970, 971-972 [1998]; *see also City of New York v Village of Tannersville*, 263 AD2d 877, 879 [1999]). Therefore, in my opinion, the restriction does not promote additional environmental interests not already addressed by the existing EPOD designations.

Finally, the Town contends that the restriction will inhibit activity on the EPODs in perpetuity, whereas the EPOD ordinance could change at any time. This is true, but it does not provide a legitimate basis for imposition of the restriction. If the Town decides to repeal its EPOD ordinance with respect to one or more of the EPODs situated on the Smiths' land, presumably it would do so because it no longer considers the designation of environmental restrictions on that type of property to be necessary or in the public interest. If restrictions were no longer in the public interest, the Town would have no valid basis for continuing them in perpetuity. Yet, under this scenario, portions of the Smiths' property would still be encumbered by the conservation restriction while other EPOD-burdened parcels would be released from the restrictions on development—a result that would be neither reasonable nor fair.

In the end, it is the Town's generally applicable EPOD ordinance itself—whose provisions the development restriction tracks—that substantially promotes the Town's valid interest in

protecting the environment. If this case involved a claim that the Town Code's EPOD regulations effected a taking of property, clearly such a challenge would fail under *Agins* because the restrictions contained in those rules substantially promote environmental interests. But the added layer of regulation sought to be imposed by the Town through the ad hoc imposition of a conservation restriction as a condition to site plan approval does not further additional legitimate environmental concerns in a meaningful way and is simply overkill. To hold otherwise effectively permits municipalities to single out particular EPOD-affected landowners for double regulation. In sum, I conclude that the Town's imposition of the conservation restriction without just compensation amounted to an unconstitutional taking.

Even if the conservation restriction does not effect a taking as the majority holds, I would still rule in favor of the Smiths because the Town's determination to demand such a condition in exchange for site plan approval was, contrary to the conclusion of the courts below, arbitrary and capricious. Although a municipality may place conditions on the approval of site plans, such authority is not limitless. Under Town Law § 274-a (4), conditions and restrictions must be "reasonable" and "directly related to and incidental to a proposed site plan." We have held that conditions are proper when they constitute "corrective measures designed to protect neighboring properties against the possible adverse effects of [a proposed] use" (*Matter of St. Onge v Donovan*, 71 NY2d 507, 516 [1988]). In contrast, conditions are invalid when "they do not seek to ameliorate the effects of the land use at issue" (*id.* at 517). Accordingly, courts have repeatedly held that a municipality's imposition of a condition which is "not reasonably designed to mitigate any demonstrable defects" is arbitrary and capricious (*Matter of Clinton v Summers*, 144 AD2d 145, 147 [1988]; *see also Matter of Castle Props. Co. v Ackerson*, 163 AD2d 785, 786-787 [1990]; *Matter of Black v Summers*, 151 AD2d 863, 865 [1989]). Where a court determines that the imposition of a condition is arbitrary and capricious, the appropriate relief is to excise the condition (*see Matter of St. Onge*, 71 NY2d at 519).

Here, pursuant to the State Environmental Quality Review Act, the Town issued a negative declaration, finding that the Smiths' proposed site project would not result in any significant adverse environmental impacts so long as the development did not occur in any of the EPODs. The Town does not dispute that

the Smiths' proposed single-family dwelling would not have an effect on any of the EPODs, and the Smiths have maintained that they intend to comply with the requirements of the Town's EPOD ordinance. The Town's stated basis for imposing the conservation restriction was "to mitigate any potentially significant adverse environmental impact upon the site or upon adjacent sites." Yet, under the Town's own findings, the proposed site plan would not cause any environmental detriments that needed to be mitigated. As such, it is evident that the restriction should have been invalidated because it was not necessary "to mitigate any demonstrable defects" and was therefore arbitrary and capricious (*see Matter of Clinton*, 144 AD2d at 147).

For the reasons stated, I would reverse the order of the Appellate Division and grant the petition with respect to the Smiths' second and third causes of action.

Chief Judge KAYE and Judges G.B. SMITH and CIPARICK concur with Judge ROSENBLATT; Judge READ dissents and votes to reverse in a separate opinion in which Judge R.S. SMITH concurs; Judge GRAFFEO dissents and votes to reverse in another opinion.

Order affirmed, with costs.