Jeda Capital-56, LLC v Village of Potsdam (2021 NY Slip Op 05902)





Jeda Capital-56, LLC v Village of Potsdam


2021 NY Slip Op 05902


Decided on October 28, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:October 28, 2021

531052
[*1]Jeda Capital-56, LLC, Appellant,
v
Village of Potsdam, Respondent.

Calendar Date:September 9, 2021

Before:Lynch, J.P., Aarons, Pritzker, Reynolds Fitzgerald and Colangelo, JJ.

Camardo Law Firm, PC, Auburn (Justin T. Huffman of counsel), for appellant.
Johnson & Laws, LLC, Clifton Park (Loraine C. Jelinek of counsel), for respondent.



Reynolds Fitzgerald, J.
Appeal from an order of the Supreme Court (Farley, J.), entered January 13, 2020 in St. Lawrence County, which granted defendant's motion for summary judgment dismissing the complaint.
Plaintiff is a limited liability company engaged in the development of a Lowe's Home Improvement Center on property located in the Town of Potsdam, St. Lawrence County. As the Town lacked the ability to provide the required water and sewer services, the property had to be annexed to defendant — a process that triggered environmental review and the preparation of an engineering report in 2007 detailing the water supply improvements proposed to service the property. Although the construction of a 160,000-gallon water tower was required in order to provide fire protection for Lowe's, defendant desired a larger-capacity, 300,000-gallon water tower that would simultaneously service Lowe's and the needs of defendant's residents. The project plans and specifications were adjusted accordingly, and construction commenced, notwithstanding the parties' failure to execute a developer agreement drafted in connection therewith.
In November 2008, plaintiff and defendant entered into a 20-year lease governing the water tower and the property upon which it was located (hereinafter the premises). The lease contemplated that plaintiff would construct the water tower — in accordance with the plans and specifications approved by defendant — and deliver the premises to defendant by a certain date, or as soon thereafter as such premises were "substantially complete," but in no case later than December 1, 2008. Within 10 days of delivery, defendant was required to provide written notice of its acceptance or refusal of the premises; upon acceptance, defendant's obligation to pay rent commenced. The parties thereafter executed an addendum to the lease — extending delivery of the substantially complete premises to no later than March 16, 2009.
Disagreements subsequently arose as to whether the premises were in fact substantially complete, prompting defendant to issue six written notices of refusal between February 2009 and February 2010. In the interim, in August 2009, the parties executed a Project Completion Agreement (hereinafter PCA), which, among other things, required plaintiff to complete certain work and expend additional funds before defendant would accept the premises. As relevant here, the PCA also included a broad indemnification clause, wherein plaintiff relinquished its right to, among other things, "institute any suit or action at law or equity against [defendant] or its [e]ngineer . . . from the beginning of the world to . . . the date of [the PCA] arising from or in any way related to the construction of the [w]ater [t]ower project and related water and sewer systems." Plaintiff similarly "release[d] and forever discharge[d]" defendant or its engineer from, among other things, any and all causes of action, damages and judgments of any kind — sounding in law or [*2]equity — "from the beginning of the world as [such claims] in any way relate[d] to the construction of the [w]ater [t]ower project and related water and sewer systems."
Although defendant accepted delivery of the water tower effective November 30, 2009, it refused to pay rent until plaintiff made a payment required under the PCA. According to plaintiff, defendant thereafter changed the locks on the water tower and otherwise obstructed access to the premises. Absent the anticipated rent payments, plaintiff defaulted on the financing for the project and its lender foreclosed, ultimately selling the premises to defendant in April 2011.
Plaintiff commenced this action against defendant in September 2016 setting forth causes of action with respect to changes to the lease agreement and for unjust enrichment.[FN1] Following joinder of issue and discovery, defendant moved for summary judgment dismissing the complaint contending that it was immune from suit pursuant to the terms of the PCA. Supreme Court granted defendant's motion, finding that the specific items for which plaintiff sought compensation were related to the construction of the water tower and the attendant water and sewer systems and, hence, were encompassed by the indemnification provision of the PCA. This appeal ensued.
In support of its motion for summary judgment, defendant submitted, among other documents, the lease agreement and addendum thereto, the 2007 engineering report, portions of the site plan and drawings for the premises, the PCA, the affidavit of its administrator, Michael Weil, and excerpts from the examination before trial testimony of plaintiff's managing member, Michael O'Neill. In opposition, plaintiff tendered an affidavit from O'Neill, together with, among other things, various versions of the unexecuted developer agreement and certain emails. Despite the parties' lengthy submissions, resolution of this appeal ultimately hinges upon the applicability of the PCA, specifically, whether the seven contested items underlying plaintiff's causes of action are related to the construction of the water tower and the attendant water and sewer systems — therefore falling within the ambit of the PCA's indemnification clause — or are unrelated to the project — therefore constituting illegal exactions for which plaintiff may seek compensation.[FN2] Those disputed items include the replacement of an altitude valve on a water tower located at Clarkson University and a pressure relief valve at defendant's water plant, changes to the telemetry system for the Lowe's water tower, the diameter and direction of the water line for the project, and the type of sanitary pump utilized, as well as plaintiff's liability for certain engineering fees incurred.
It has long been the rule "'that, when parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms,'" particularly in the context of real property transactions and where the instrument [*3]in question was negotiated at arm's length between sophisticated and counseled business people (Vermont Teddy Bear Co., Inc. v 538 Madison Realty Co., 1 NY3d 470, 475 [2004] [ellipsis omitted], quoting W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162 [1990]; see MLB Constr. Servs., LLC v Dormitory Auth. of the State of N.Y., 194 AD3d 1140, 1143 [2021], lv dismissed ___ NY3d ___ [Oct. 14, 2021]). Upon appeal, plaintiff does not argue that the PCA is ambiguous, nor does it contend that its execution was procured by fraud or overreaching;[FN3] O'Neill acknowledged that plaintiff was represented by counsel during the negotiation of the PCA. Further, the indemnification provision set forth in the PCA, by its own terms, could not be more all-encompassing — "release[ing] and forever discharg[ing]" defendant or its engineer from "any and all actions, causes of action, suits, debits, sums of money, damages, judgments, controversies, agreements, promises, executions and/or claims of any kind, in law or equity, which . . . [plaintiff] has ever had or shall have upon or by reason of any matters, whatsoever from the beginning of the world[,] as it in any way relates to the construction of the [w]ater [t]ower project and related water and sewer systems." Against this backdrop, we turn to the specific items for which plaintiff seeks compensation.
We begin with the altitude valve found on the Clarkson University water tower and pressure relief valve at defendant's water plant.[FN4] As evidenced by O'Neill's examination before trial testimony, the 2007 engineering report and Weil's affidavit, the altitude valve regulates the height of the water within the respective towers, i.e., it is the mechanism that "controls the interaction of varying water fill/draw rates between the two water towers and the related water systems" to ensure that the towers are adequately filled and do not overflow. Notwithstanding O'Neill's representation that defendant allowed the altitude valve on the Clarkson University tower to fall into disrepair and that the replacement thereof should have constituted a capital repair for defendant, it is clear from the record that the construction of the Lowe's water tower necessarily required both towers to have functioning altitude valves in order for the entire system to operate properly. Indeed, O'Neill acknowledged that the water systems that service both water towers are connected; as such, activity in either tower affects the pressure in the water line, thereby affecting the respective water levels.
We reach a similar conclusion with respect to the pressure relief valve at defendant's water plant. O'Neill acknowledged that this valve, which "blows if the pressure gets too high," was attached to the water system that serviced the Lowe's water tower, and Weil averred that the valve was necessary to "reduce the pressure to protect the system, including the related water system piping, appurtenances, and private resident facilities utilizing the [*4]same water system servicing both the Lowe's and Clarkson University water towers." In short, regardless of which party otherwise should have borne responsibility for the maintenance or repair of such valves, the record establishes that the altitude and pressure relief valves were part and parcel of the Lowe's water tower and the related water and sewer systems and, as such, fell squarely within the indemnification clause of the PCA.
With respect to the telemetry system, Weil explained that sensors installed on the Lowe's water tower measured certain physical or electrical data and relayed that information to defendant's water plant. That relay could be accomplished via either a wired or radio system; the original plans called for a wired system, but plaintiff ultimately installed a radio system, purportedly at defendant's behest. Again, regardless of the telemetry system depicted on the original or revised project drawings or desired by the parties' respective engineers, Weil's affidavit establishes that a radio telemetry system was installed by plaintiff on the Lowe's water tower and was necessary in order to communicate with defendant's water plant and ensure the proper function of the water system, again bringing this component within the ambit of the PCA indemnification clause.
The record further establishes that the size of the water line installed, the direction of/route taken by such line and the type of pump utilized at the sanitary pump station located on the premises each were part of the Lowe's water tower and/or the related systems. The 2007 engineering report, the relevant project drawings and Weil's affidavit all reveal that plaintiff agreed to the installation of a 12-inch water line to service both the Lowe's water tower and the related water distribution system and to enable defendant to, among other things, better meet the future need of its residents. Those same documents demonstrate that the change in the direction of or route taken by the water line, which resulted in approximately 1,400 additional lineal feet of line, also was accommodated by plaintiff in order to provide better access for future users. Finally, the record reveals that a sanitary pump station was required on site due to the elevation at which the Lowe's store was situated, requiring sewage to be pumped uphill. Although the type of pump utilized was changed from the initial proposal, such change was depicted on the relevant project drawing (C4.09), which O'Neill acknowledged served as the blueprints for the project. More to the point, the issue is not — as plaintiff contends — whether the changes made to the size, length or direction of the water line and/or the type of sanitary pump installed were agreed upon by the parties or unilaterally demanded by defendant but, rather, whether those components related to the construction of the Lowe's water tower and the corresponding water and sewer systems. As the record demonstrates that such components were [*5]so related, the indemnification clause of the PCA applied.[FN5]
Finally, although the parties debate whether the provisions of 6 NYCRR 617.13 (c) apply with respect to the engineering fees incurred for the project and, if so, whether plaintiff has exhausted its administrative remedies relative thereto, this issue need not detain us. The engineering fees — estimated to be $75,000 — were a component of the total project cost from the outset and plainly were related to the construction of the water tower and the related systems, as well as the environmental review undertaken in connection therewith, and the PCA expressly addressed plaintiff's obligation to pay certain outstanding engineering fees and to replenish the engineering escrow account. As the indemnification clause of the PCA again applied, Supreme Court properly granted defendant's motion for summary judgment relative to plaintiff's cause of action for changes to the lease agreement.
We reach a similar conclusion with respect to plaintiff's claim for unjust enrichment, which is premised upon the same disputed items previously addressed. Simply put, "a party cannot recover damages for unjust enrichment based on conduct or events governed by a written agreement" (Tompkins Fin. Corp. v John M. Floyd & Assoc., Inc., 144 AD3d 1252, 1256 [2016]). Although "an indemnity contract will not be held to have retroactive effect unless by its express words or necessary implication it clearly appears to be the parties' intention to include past obligations" (Cacanoski v 35 Cedar Place Assoc., LLC, 147 AD3d 810, 813 [2017] [internal quotation marks and citation omitted]), the PCA — by its express terms — provided defendant with indemnification from, as relevant here, "claims of any kind, in law or equity, which . . . [plaintiff] has ever had or shall have upon or by reason of any matters, whatsoever from the beginning of the world[,] as it in any way relates to the construction of the [w]ater [t]ower project and related water and sewer systems." Under these circumstances, the PCA is entitled to retroactive effect, thereby barring plaintiff's cause of action for unjust enrichment. In light of the foregoing, Supreme Court properly granted defendant's motion for summary judgment dismissing the complaint in its entirety. Plaintiff's remaining arguments, to the extent not specifically addressed, have been examined and found to be lacking in merit.
Lynch, J.P., Aarons, Pritzker and Colangelo, JJ., concur.
ORDERED that the order is affirmed, without costs.



Footnotes

Footnote 1: Plaintiff previously commenced a similar action in the United States District Court for the Northern District of New York, which, in response to defendant's motion for summary judgment and as relevant here, declined to exercise supplemental jurisdiction over plaintiff's state law claims and dismissed the causes of action for changes to the lease agreement and unjust enrichment without prejudice (JEDA Capital-56, LLC v Village of Potsdam, New York, 2014 WL 12651236, *12 [ND NY Sept. 30, 2014], affd 661 Fed Appx 20, 24 [2d Cir 2016], cert denied ___ US ___, 137 S Ct 1224 [2017]).

Footnote 2: "Exactions are defined as land-use decisions conditioning approval of development on the dedication of property to public use" and may, under certain circumstances, rise to the level of an unconstitutional taking (Matter of Smith v Town of Mendon, 4 NY3d 1, 10 [2004] [internal quotation marks, emphasis and citation omitted]; see Consumers Union of U.S., Inc. v State of New York, 5 NY3d 327, 354 [2005]). Plaintiff asserts that defendant, by requiring plaintiff to perform additional work on the water tower project without compensation and conditioning its acceptance of the project upon such additional work, effectively appropriated plaintiff's "property" without just compensation.

Footnote 3: Although plaintiff's complaint alleged that it executed the PCA under duress, it has neither pursued nor substantiated that claim upon appeal.

Footnote 4: These valves existed at their respective locations because — prior to 1996 — defendant utilized two water towers. Although the Clarkson University tower was the only tower in use at the time that the Lowe's water tower was constructed, the addition of the latter tower required the two towers to work in conjunction with one another, resulting in the need for the once-dormant altitude and pressure relief valves to again function properly.

Footnote 5: Given the sweeping language of the indemnification clause, the issue of when the disputed items arose relative to the parties' execution of the PCA is not dispositive. That said, although O'Neill could not recall whether the altitude valve or the pressure relief valve were installed before or after the signing of the PCA, the telemetry system, water line and sanitary pump all appear to have been installed well before the execution of the PCA.